Tina M. Ezzell
State Bar No. 013825

**TIFFANY & BOSCO**
P.A.

THIRD FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9240
TELEPHONE: (602) 255-6000
FACSIMILE:  (602) 255-0103
E-Mail: tme@tblaw.com

Attorneys for Plaintiff Alfonzo Smith

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Alfonzo Smith,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>Chrysler Group, LLC, a Delaware limited liability company,<br><br>　　　　　　　Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Alfonzo Smith, through counsel undersigned, complains and alleges as follows:

### PARTIES, JURISDICTION, & VENUE

1. This action arises under the Federal Automobile Dealers Franchise Act (also known as the Automobile Dealers Day in Court Act), 15 U.S.C. §§ 1221 to 1226 (hereafter the "ADDCA"), various provisions of Arizona's motor vehicle franchise regulation statutes, and common law.

2. Defendant Chrysler Group, LLC ("Chrysler") is a Delaware Limited Liability Company with its principal place of business in Auburn Hills, Michigan. Chrysler does substantial business in Arizona and has registered with the Arizona

Corporation Commission for service of process in Arizona.

3. Chrysler is an "automobile manufacturer" as that term is used in the ADDCA and an automobile "franchisor" and "factory" pursuant to Arizona's motor vehicle franchise regulation statutes, A.R.S. § 28-4451 *et seq*.

4. Plaintiff Alfonzo Smith is an individual residing in Maricopa County, Arizona. Plaintiff owns a majority interest in Superstition Springs Chrysler Jeep, Inc. (the "Dealership"), a Chrysler brand dealer located in Mesa, Arizona. At all relevant times hereto, Plaintiff was a Dealership principal, General Manager, and member of the Board of Directors.

5. Plaintiff is an "automobile dealer" as defined under the ADDCA and a "franchisee" pursuant to Arizona's motor vehicle franchise regulation statutes, A.R.S. §§ 28-4301(12)-(13).

6. This events giving rise to this action involve a "franchise," as that term is defined in the ADDCA and in A.R.S. §§ 28-4301(12)-(13), between Plaintiff and Defendant concerning the ownership and operation of the Dealership.

7. This Court has subject matter jurisdiction over the federal claims pursuant to 15 U.S.C. §§ 1222; 1226 and 28 U.S.C. § 1331 and supplemental jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367.

8. The Court also has subject matter jurisdiction based on diversity of citizenship because complete diversity exists between the parties and the amount in controversy exceeds $75,000.00.

**BACKGROUND**

9. Automobile manufacturers have a long and storied history in the United States of employing coercive tactics with the dealers who have sold their vehicles. In recognition of the great imbalance of bargaining power between manufacturers and

-2-

dealers, both the United States Congress and the State of Arizona have enacted statutes designed to limit manufacturer control and coercion of dealers.

10. At the federal level, the ADDCA guarantees dealers the right to bring an action in United States District Court when an automobile manufacturer fails "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer."

11. Further recognizing attempts by manufacturers to limit the ability of dealers to have their day in Court, Congress also enacted the Motor Vehicle Franchise Contract Arbitration Act as part of the ADDCA, which prohibits a manufacturer from compelling arbitration of a franchise contract dispute notwithstanding the language of a franchise contract or other laws.

12. Similarly, in 1995 the Arizona legislature enacted a comprehensive statutory framework for the licensing and regulation of motor vehicle manufacturers and dealers doing business in Arizona. Amongst other things, the Arizona statutes prohibit coercion and "any other act unfair to the dealer by threatening to cancel or not renew a franchise existing between the manufacturer…and the dealer."

13. In 1997, Arizona amended the anti-coercion statute, to strengthen the bargaining position of dealers in their relationships with manufacturers. In doing so, the legislature acknowledged that dealers have continued to express concern regarding their weak bargaining position relative to manufacturers. Legislation was deemed essential to ensure a sound system for the distribution of vehicles and to help even out the playing field between manufacturer and dealer.

14. In 2000, Arizona passed legislation prohibiting manufacturers from owning or controlling dealerships, except on very limited and temporary bases.

## FACTUAL ALLEGATIONS

15. Plaintiff has been a Chrysler brand dealer for approximately 30 years, in Arizona and elsewhere.

16. In or about 1999, Plaintiff entered into Chrysler's Marketing and Investment Program (hereafter the "MIP").

17. According to publicly available Chrysler advertisements, the MIP "offers individuals who possess the right experience, exceptional ability and the necessary aggressiveness to succeed, the opportunity to both invest in, and operate dealerships which sell and service Chrysler, Jeep® and Dodge products."

18. The stated objective of the MIP is to allow the General Manager of a Chrysler-owned dealership to purchase Chrysler's stock interests over time, eventually becoming the sole owner of the dealership.

19. The MIP also purports to offer minority candidates, like Plaintiff, the optimal opportunity to become motor vehicle dealership owners.

20. Plaintiff's initial investment into formation of the Dealership rendered him a 5% owner. Pursuant to the stated objectives of the MIP, Plaintiff believed that he would be able acquire and retain full and complete ownership of the Dealership within a reasonable period of time.

21. In or about 2002, the Dealership opened for business.

22. As required by the MIP, Plaintiff became the General Manager of the Dealership and a member of the Board of Directors.

23. Plaintiff also signed a Sales and Service Agreement on behalf of the Dealership, setting forth the basic terms of the franchise between Chrysler and the Dealership.

24. The Sales and Service Agreement, although entered into between the

Dealership and Chrysler (with Plaintiff signing as Director and principal) recognized that Plaintiff was central to the franchise.

25. Amongst other things, the Sales and Service Agreement provided that Chrysler had "placed its trust in the personal abilities, expertise, knowledge and integrity of [the Dealership's] principal owners and management personnel…." Indeed, the Sales and Service Agreement specifically required Plaintiff to remain the Dealership's manager and principal, stating that Chrysler had "entered into [the franchise] relying on the active, substantial and continuing personal participation in the management of the [Dealership's] organization by" Plaintiff as General Manager. Pursuant to the Sales and Service Agreement, the Dealership was prohibited from changing Plaintiff's role as General Manager without Chrysler's written approval.

26. The Sales and Service Agreement further recognized Plaintiff as the 100% owner of voting stock in the Dealership. Although this statement may have been incorrect (Chrysler purported to hold all voting stock in a separate Stock Agreement), the Dealership was prohibited from changing Plaintiff's ownership interest without Chrysler's written approval.

27. The Sales and Service Agreement Additional Terms and Provisions restricted Chrysler's ability to terminate the franchise without notice or cause, as did both Federal and Arizona law.

28. A Term Sales and Service Agreement between the Dealership and Chrysler also recognized Plaintiff's integral roles as General Manager and stockholder. This agreement reiterated Chrysler's reliance on Plaintiff's continued personal participation in the ownership and management of the Dealership.

29. By September 18, 2003, Plaintiff had invested $314,200 into the Dealership, bringing his ownership interest to an amount that met or exceeded 25%.

1  Chrysler's investment was, at that time, $958,300.

2  30. On September 30, 2003, Plaintiff, as General Manager of the Dealership, entered into a Stock Agreement with Chrysler setting forth the terms under which Plaintiff would continue to retire the remaining Dealership preferred stock from Chrysler. The Stock Agreement required Plaintiff to purchase Chrysler's stock using a minimum of one-half of any bonus money he earned as General Manager of the Dealership.

31. The calculation of bonuses was governed by a Bonus Agreement, also entered on September 30, 2003, between Plaintiff and the Dealership. Pursuant to the Bonus Agreement, the Dealership would provide Plaintiff a bonus equivalent to 25% of the operating profit for each fiscal year. The Bonus Agreement also provided that Plaintiff's employment was "at will" and that the Board of Directors of the Dealership retained the absolute right to terminate his employment and the Bonus Agreement. Chrysler, as the sole voting stockholder of the Dealership, also controlled the other two members of the Board of Directors, who were compensated Chrysler employees. Therefore, Chrysler maintained total control and could cause Plaintiff's removal as Director and an employee of the Dealership at any time.

32. Pursuant to the Stock Agreement, Plaintiff had no voting rights in the Dealership until all of Chrysler's preferred stock in the Dealership had been retired by Plaintiff's stock purchases. Thus, even if Plaintiff eventually became a majority owner of all stock, he was effectively without any control over his job security, the Dealership, or over his ability to complete his purchase of the remaining stock.

33. Nevertheless, based on the Stock Agreement provisions and profitability of the Dealership over the course of ten years, Plaintiff hoped that he would be the full and complete owner of the Dealership by 2013.

34. The Stock Agreement also provided Chrysler with discretion to deny

-6-

1  Plaintiff's purchase of Dealership stock in certain circumstances.

2  35. The Sales and Service Agreement Additional Terms and Provisions created a Minimum Sales Responsibility ("MSR") for the Dealership. The purported formula used by Chrysler to determine MSR is set forth in the Sales and Service Agreement Additional Terms and Provisions and is a combination of geographic territory, new vehicle registration figures, and various other factors set in Chrysler's "sole discretion."

36. The Sales and Service Agreement Additional Terms and Provisions also provided Chrysler with the ability to set Minimum Working Capital requirements for the Dealership.

37. As a result of Plaintiff's laboring effort, profitability of the Dealership rose steadily from 2002 through 2005, when it reached $789,995.

38. Plaintiff used his bonus money to continue his acquisition of Chrysler's Dealership stock.

39. From 2006 through 2009, the entire auto industry suffered through the worst recession since the Great Depression.

40. In 2009, Chrysler LLC (and twenty-four subsidiaries) filed for bankruptcy protection. One of the primary purposes of the bankruptcy was to terminate 789 dealership agreements.

41. Despite its drop in sales, Chrysler did not terminate or close the Dealership.

42. By 2011, Dealership profits were climbing again. In 2011, the Dealership realized a profit of $449,150 and Plaintiff received a year-end bonus.

43. Before 2012, Plaintiff had acquired a majority ownership interest and in 2012, Dealership profits were skyrocketing.

44. Plaintiff believed that with his bonus for 2012 he would be able to finally retire Chrysler's remaining Dealership stock and become the sole owner.

-7-

45. On October 4, 2012, a Chrysler employee emailed Plaintiff outlining the requirements Chrysler deemed necessary for him to complete his purchase of Chrysler's remaining Dealership stock. Chrysler informed Plaintiff of an arbitrary deadline of March 2013, to complete his acquisition and indicated that the Dealership MSR requirements were not being met, thus making Plaintiff's acquisition "very difficult."

46. Notwithstanding the email, sales were continuing to rise (year-to-date September profits had already topped $802,863) and Plaintiff reasonably believed he would be able to meet all of Chrysler's requirements.

47. On or about October 29, 2012, without any prior notice, a Chrysler representative came to the Dealership and forcibly removed Plaintiff, informing him that he was being terminated from the Board of Directors of the Dealership and as General Manager. A security guard escorted Plaintiff from the Dealership.

48. Chrysler neither notified Plaintiff or the Director of the Arizona Department of Transportation of its intended termination, cancellation, or nonrenewal of Plaintiff's franchise.

## COUNT ONE
### (Automobile Dealers Day in Court Act)

49. The above allegations are incorporated herein by this reference.

50. Defendant is an "automobile manufacturer" within the meaning of the ADDCA and engaged in commerce throughout the United States.

51. The various agreements between Defendant, Plaintiff, and the Dealership constitute a "franchise" within the meaning of the ADDCA.

52. The Sales and Service Agreement recognizes that Plaintiff was an integral part of the franchise whose "abilities, expertise, knowledge and integrity" were material to Chrysler.

53. The Sales and Service Agreement further recognizes Chrysler's reliance on

-8-

Plaintiff's "substantial continuing personal participation in the management of" the Dealership.

54. The Sales and Service Agreement also states that Plaintiff owned 100% of the voting stock in the Dealership, notwithstanding the provision of the Stock Agreement providing that so long as Chrysler owned any shares of the Dealership, Plaintiff would have no voting rights.

55. As principal, majority stock holder, General Manager of the Dealership, and integral party to the Sales and Service Agreement, Plaintiff is an "automobile dealer" within the meaning of the ADDCA and entitled to bring an action against Chrysler.

56. Chrysler failed to act in good faith towards Plaintiff in performing the terms of the parties' franchise and in terminating, cancelling or failing to renew the franchise in violation of the ADDCA by, amongst other things, setting arbitrary MSR and Working Capital Requirements, arbitrarily setting a deadline for completion of Plaintiff's acquisition of Dealership stock without explanation or consultation with Plaintiff, misrepresenting to Plaintiff in the Sales and Service Agreement that he owned 100% of the voting stock in the Dealership when the Stock Agreement provided that he would have no voting rights until all of Chrysler's stock was retired, representing to the Arizona Department of Motor Vehicles that Plaintiff was the sole owner of the Dealership in order to obtain required licensing to operate the Dealership, and by terminating Plaintiff as General Manager and Director without good cause or proper notice or opportunity to cure when Plaintiff was within the final phase of his acquisition of the remaining Chrysler interest.

57. Plaintiff has not consented to arbitrate his claims against Chrysler after the disputes set forth herein arose and, therefore, has the right to assert the claims herein in this Court.

58. As a result of Chrysler's violations of the ADDCA, Plaintiff was damaged financially in an amount to be proven at trial.

**COUNT TWO**
**(Declaratory Judgment as to Franchisee Status)**

59. The above allegations are incorporated herein by this reference.

60. Arizona law allows any person interested under a written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a statute, contract or franchise to have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

61. When Chrysler failed to provide notice to the Director of the Arizona Department of Transportation of its intent to terminate Plaintiff's franchise in violation of the requirements of A.R.S. § 28-4453(D), Plaintiff requested a hearing with the Department of Transportation.

62. The Department of Transportation expressly recognized that Plaintiff was a "franchisee" within the meaning of Arizona law in a written order dated April 27, 2013.

63. The Department of Transportation, nonetheless, refused to hold a hearing, citing the arbitration provisions of the Sales and Service Agreement.

64. Plaintiff seeks a declaratory judgment (1) confirming and holding that he is a "franchisee" pursuant to Arizona law, A.R.S. § 28-4301(13), as already found by the Department of Transportation, (2) holding that Plaintiff is a person entitled to receive the notice prescribed by A.R.S. § 28-4453(D); (3) holding that Plaintiff is not required to arbitrate his dispute against Chrysler pursuant to the Motor Vehicle Franchise Contract Arbitration Act, 15 U.S.C. § 1226; and (4) holding that Chrysler may not terminate Plaintiff's franchise absent a hearing under A.R.S. § 28-4456 *et seq* and absent good cause for the termination as outlined in A.R.S. § 28-4452(A) and § 28-4457.

**COUNT THREE**
**(Declaratory Judgment as to Bona Fide Nature of Relationship)**

65. The above allegations are incorporated herein by this reference.

66. Chrysler is a "factory" within the meaning of Arizona law.

67. Arizona law, A.R.S. § 28-4460, prohibits a factory from competing with its dealers by, amongst other things, possessing an ownership interest in a motor vehicle dealership or acting in the capacity of a new motor vehicle dealer.

68. A limited exception exists to the statutory prohibition against a manufacturer possessing an ownership interest in a motor vehicle dealership allowing a manufacturer to possess an ownership interest in a motor vehicle dealership on a temporary basis, but only if the manufacturer enters into a "bona fide relationship" with a "qualified person" who, among other things, invests in the motor vehicle dealership and "can expect to acquire and retain full and complete ownership of the dealership within a reasonable period of time that is not longer than ten years and on reasonable terms and conditions." A.R.S. § 28-4460(B)(1)(b).

69. Pursuant to Plaintiff's Bonus Agreement, he was at all times an "at will" employee and Chrysler, as sole voting stockholder, retained the full right to terminate him as a member of the Board of Directors of the Dealership. Because Chrysler controlled the other members of the Board of Directors, who were compensated Chrysler employees, Chrysler could also cause Plaintiff's termination as General Manager at any time, and purportedly for any reason or no reason at all without regard to the good cause requirements of federal or state law.

70. The one-sided nature of the agreements in Chrysler's favor rendered Plaintiff's ability and expectation of acquiring and retaining full and complete ownership of the Dealership within a reasonable period of time illusory.

71. Chrysler's actions in terminating Plaintiff without good cause when he

owned a majority of the Dealership stock, before he could complete his purchase of the last remaining shares, and at a time when Dealership profits were skyrocketing proves the illusory nature of the relationship.

72. Plaintiff seeks a declaratory judgment either holding that the relationship between he and Chrysler was not a "bona fide relationship with a qualified person" within the meaning of Arizona law and, accordingly, that Chrysler has been in violation of Arizona law since 2002 by improperly possessing an ownership interest in the Dealership, or holding that the "at will" provisions of the Bonus Agreement are unenforceable as contrary to Arizona law.

## COUNT FOUR
### (Civil Damages Pursuant to A.R.S. § 28-4307; Chrysler's Ownership of the Dealership)

73. The above allegations are incorporated herein by this reference.

74. As a "factory," Chrysler is required to comply with Arizona's laws governing the sales of its vehicles in Arizona.

75. Chrysler is prohibited from owning an interest in a dealership in Arizona unless it is in a "bona fide relationship" with a "qualified person" who, among other things, invests in the motor vehicle dealership and "can expect to acquire and retain full and complete ownership of the dealership within a reasonable period of time that is not longer than ten years and on reasonable terms and conditions."

76. Pursuant to Plaintiff's Bonus Agreement, he was at all times an "at will" employee (General Manager) of the Dealership. Chrysler, which possessed all voting stock in the Dealership, also controlled the other members of the Board of Directors who were compensated Chrysler employees. Accordingly, Chrysler maintained the absolute right and ability to remove Plaintiff from the Board of Directors of the Dealership and cause his termination as General Manager at any time.

77. The Stock Agreement provided that if Plaintiff ceased being General Manager of the Dealership "for any reason," his right to acquire Dealership stock would cease and he would be obligated to relinquish his stock to Chrysler. Alternatively, Chrysler could take steps to dissolve the Dealership. Whether through a return of his stock or dissolution of the dealership, a termination of his position as General Manager was equivalent to a termination of Plaintiff's rights as a franchisee.

78. Because Chrysler chose to be an owner of the Dealership, Arizona law required that its relationship with Plaintiff be "bona fide" and the Plaintiff be provided with a real expectation of acquiring and retaining full and complete ownership of the Dealership within a reasonable period.

79. Chrysler's ability to cause Plaintiff's termination as General Manager for any reason, with or without good cause, rendered Plaintiff's expectation of acquiring and retaining full and complete ownership of the dealership illusory because upon his termination as General Manager, all rights to acquire and retain Dealership stock ceased pursuant to the Stock Agreement.

80. Thus, Chrysler either violated the express provisions of Arizona law by improperly owning an interest in the Dealership since 2002, or the provisions of the Bonus Agreement rendering Plaintiff an "at will" employee and the provisions of Stock Agreement providing that upon termination as General Manager, Plaintiff's ability to acquire Dealership stock ceased are unenforceable in contravention of Arizona law.

81. As a result of Chrysler's violations of Arizona law, Plaintiff has been damaged in an amount to be proven at trial.

**COUNT FIVE**
**(Civil Damages Pursuant to A.R.S. § 28-4307;**
**Chrysler's Failure to Provide Notice and Absence of Good Cause)**

82. The above allegations are incorporated herein by this reference.

-13-

83. Arizona law requires "good cause for the termination, cancellation, or nonrenewal of a franchise," notwithstanding other terms or provisions of an agreement. A.R.S. §§ 28-4456, 28-4457.

84. The Arizona Department of Transportation expressly recognized that Plaintiff is a "franchisee" pursuant to Arizona law.

85. Chrysler, as a "franchisor", was required by A.R.S. § 28-4453(D) to provide notice to Plaintiff and the Director of the Department of Transportation of its intent to terminate Plaintiff's franchise and to thereafter prove at a hearing that good cause existed to terminate Plaintiff's franchise.

86. Chrysler failed to provide the required notice and failed to prove it had "good cause" to terminate, cancel, or refuse to renew Plaintiff's franchise as required by A.R.S. § 28-4457.

87. At the time Chrysler caused Plaintiff's termination as General Manager, Dealership profits were skyrocketing and Chrysler did not have "good cause" under Arizona law to terminate Plaintiff's franchise.

88. As a result of Chrysler's failure to provide the required notice of its intended termination and its actual termination of Plaintiff's franchise without "good cause," Plaintiff has been damaged in an amount to be proven at trial.

**COUNT SIX**
**(Breach of Contract and Breach of the Implied**
**Covenant of Good Faith and Fair Dealing)**

89. The above allegations are incorporated herein by this reference.

90. Implied in every contract is a covenant of good faith and fair dealing which prohibits any party to a contract from acting in a manner that deprives any other party of the benefit of its bargain.

91. A party can breach the covenant of good faith and fair dealing both by

1 exercising express discretion in a way inconsistent with another party's reasonable
2 expectations and by acting in ways not expressly excluded by the contract's terms but
3 which nonetheless bear adversely on a party's reasonably expected benefits of the
4 bargain.

5     92.    Chrysler breached both the express and implied terms of its contracts by
6 arbitrarily setting a deadline for completion of Plaintiff's acquisition of Chrysler's
7 remaining Dealership stock, arbitrarily determining MSR requirements and Minimum
8 Working Capital requirements in a way that deprived Plaintiff of the benefits of his
9 agreements with Chrysler and the Dealership, and improperly exercising its discretion to
10 remove Plaintiff as General Manager and Director of the Dealership without good cause
11 and in violation of both federal and state statutory requirements and by terminating
12 Plaintiff's employment in bad faith.

13     93.    As a result of Chrysler's express and implied breaches of contract, Plaintiff
14 was damaged financially in an amount to be proven at trial.

15

16     WHEREFORE, Plaintiff demands judgment against Defendant as follows:
17         a. Awarding Plaintiff damages in an amount to be proven at trial;
18         b. Entering a declaratory judgment:
19             i. Confirming and holding that Plaintiff is a "franchisee" pursuant
20                to Arizona law, A.R.S. § 28-4301(13), as already found by the
21                Department of Transportation,
22            ii. holding that Plaintiff is a person entitled to receive the notice
23                prescribed by A.R.S. § 28-4453(D);
24           iii. holding that Plaintiff is not required to arbitrate his dispute
25                against Chrysler pursuant to the Motor Vehicle Franchise
26

Contract Arbitration Act, 15 U.S.C. § 1226;

    iv. holding that Chrysler may not terminate Plaintiff's franchise absent a hearing under A.R.S. § 28-4456 *et seq* and absent good cause for the termination as outlined in A.R.S. § 28-4452(A) and § 28-4457; and

    v. holding that the relationship between Plaintiff and Chrysler was not a "bona fide relationship with a qualified person" within the meaning of Arizona law and, accordingly, that Chrysler has been in violation of Arizona law since 2002 by improperly possessing an ownership interest in the Dealership or holding the "at will" provisions of the Bonus Agreement are unenforceable as contrary to Arizona law.

c. Awarding Plaintiff his costs and attorneys' fees incurred herein;

d. Awarding Plaintiff pre- and post-judgment interest;

e. Awarding Plaintiff consequential and incidental damages; and

f. Awarding such further relief as the Court deems appropriate.

DATED this 21st day of August, 2013.

                TIFFANY & BOSCO, P.A.

                By: /s/Tina M. Ezzell
                    Tina M. Ezzell
                    Third Floor Camelback Esplanade II
                    2525 East Camelback Road
                    Phoenix, Arizona 85016-4237
                    Attorneys for Plaintiff Alfonzo Smith