WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Alfonzo Smith,

               Plaintiff,

v.

Chrysler Group LLC,

               Defendant.

No. CV-13-01732-PHX-NVW

**ORDER**

Before the Court is Defendant Chrysler Group, LLC's Motion to Dismiss (Doc. 21), Plaintiff Alfonzo Smith's Response (Doc. 22), and the Reply (Doc. 23). For the following reasons, Chrysler Group's Motion to Dismiss (Doc. 21) will be denied in part and granted in part.

## I.    FACTS

For the purpose of this Motion to Dismiss under Rule 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the non-moving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). In 1999, Plaintiff Alfonzo Smith voluntarily sold his ownership interest in a Virginia-based Chrysler dealership as part of a Chrysler plan to consolidate dealerships. In exchange for selling his ownership interest in the Virginia dealership, Smith was given a first right of refusal on purchasing a new dealership. He exercised that right by entering into a contract purchase the Superstition Springs Chrysler Dealership (the "Dealership") that Chrysler was constructing in Superstition Springs, Arizona. To finance his purchase, Smith opted into Chrysler's Marketing Investment Program which allowed him to

finance the purchase of the dealership with minimal initial capital outlay.

In 2001, the Dealership submitted an application to transact business in Arizona to the Arizona Corporation Commission.  The Dealership's application was approved, but Smith was not listed as a director or officer.  The application listed all officers and directors as located at "1000 Chrysler Drive, Auburn Hills, MI 48326."  (Doc. 21, Exb. A).  After gaining approval to transact business in Arizona, Chrysler and the Dealership executed a Sales and Service Agreement which outlined Chrysler's requirements of the franchise Dealership, including the minimum working capital. (Doc. 21, Exb. B).  The agreement listed Smith as the Dealership's General Manager and awarded him 100% of the Dealership's non-voting stock.  Chrysler's predecessor is listed as owning 100% of the voting stock, and Richard Bridenstine is listed as the Dealership's president.  Chrysler asserts the Sales and Service Agreement was executed by Bridenstine on behalf of the dealership, but Smith asserts he was the one to sign on behalf of the dealership.  The signature on the document filed with this Motion suggests Smith may have signed the agreement because although the signature is illegible, the title of the signee is described as "Director/GM," which suggests it was signed by the General Manager, Smith.  A second Sales and Service Agreement was executed in 2009 with what appears to be the same signature.  (Doc. 21, Exb. E).

In 2003, Smith and Chrysler executed the Stock Agreement which outlined the terms under which Smith and Chrysler could purchase and sell their respective stock holdings.  Under the agreement, Smith owned 100% of the Dealership's common, non-voting stock while Chrysler owned 100% of the preferred, voting stock.  It was contemplated that Smith would eventually purchase all of Chrysler's preferred stock and obtain complete ownership of the Dealership.  The Stock Agreement gave Smith the right to ask the Dealership's Directors to redeem all shares of preferred stock, but Chrysler was permitted to decline the request if the Dealership lacked the minimum working capital outlined in the Dealership's Sales and Service Agreement.  The Stock Agreement also provided that until Smith had purchased all of the preferred, voting stock, Chrysler owed all shares of voting stock and could use that voting power to remove Smith as Director or

General Manager.

At the same time he executed the Stock Agreement, Smith entered into a Bonus Agreement with the Dealership which provided that, in addition to his salary, the Dealership would pay him a bonus of 25% of the operating profit, at least half of which Smith was required to use to purchase preferred stock from Chrysler. In the Bonus Agreement, Smith signed his initials next to the paragraph describing how he was an at-will employee, subject to the absolute right of the Dealership or Chrysler to remove him. (Doc. 21, Exb. C). If Smith ceased to be General Manager before acquiring all of Chrysler's preferred stock, Smith would be forced to surrender his stock to Chrysler at a value determined by the Dealership's auditor. (*Id*.).

In his role as General Manager, Smith undertook many of the responsibilities of any other franchised dealer, including negotiating financing arrangements with lenders to stock the Dealership and abiding by Chrysler's franchise terms and conditions. (Docs. 22). By 2012, Smith was a majority owner in the Dealership, holding 68.5% of the outstanding stock. (Doc. 19, ¶ 52). Financials as of August 2012 suggest Smith would have been able to use his year end bonus to purchase Chrysler's remaining preferred stock. (*Id*. at ¶ 66).

In September 2012, a Chrysler Area Sales Manager visited Smith at the Dealership to go over the June 2012 sales numbers, specifically the Minimum Sales Responsibility, a metric designed by Chrysler to establish threshold sales quotas for dealerships. (Doc. 19, ¶¶ 54-56). The Dealership was meeting the Minimum Sales Responsibility for certain vehicles but falling below the Minimum Sales Responsibility on others. (*Id*. at ¶ 54). A "Dealer Minimum Sales Responsibility Action Plan" was developed to address various ways Chrysler and Smith could improve the Minimum Sales Responsibility metric. (*Id*. at ¶ 55). Less than a month later, a Chrysler employee, Mitch Mitchel emailed Smith a spreadsheet covering the Dealership's August 2012 financials. (*Id*. at ¶ 56). Mr. Mitchell stated that because the dealership was only at 71.2% of the Minimum Sales Responsibility, and needed to be at 100% Minimum Sales Responsibility for Smith to complete his acquisition of the Dealership, it seemed unlikely Chrysler would allow

Smith to purchase all outstanding stock by the March 2013 deadline.  (*Id*. at ¶¶ 57-58).  Up until that point, Smith was unaware of any preferred stock acquisition deadline, but he was unconcerned because it was his understanding that Chrysler rarely took adverse action against dealerships that fell behind the Minimum Sales Responsibility, and he was confident he would be able to purchase the outstanding stock by that date.  (*Id*., Doc. 22).

On October 29, 2012, Smith was terminated as General Manager and as a member of the Dealership's Board of Directors.  (Doc. 19, ¶ 62).  Chrysler notified neither Smith nor the Director of the Arizona Department of Transportation of its actions.  (*Id*. at ¶ 63).  Smith asserts that Mr. Mitchell informed him that the reason for his termination was that one of his employees may have had a conflict of interest with an outside company the Dealership did business with.  (*Id*.).  Smith now asserts that Chrysler has either terminated or is about to terminate the Dealership franchise in bad faith and has moved forward with its plan by registering the trade name "Superstition Springs Chrysler Jeep Dodge Ram," which is owned by Superstition Springs Mid LLC, a Chrysler-controlled entity.  (Doc. 22).

Chrysler asserts it was entitled to fire Smith because he was an at-will employee of the Dealership, as defined in the Bonus Agreement.  (Doc. 21, Exb. D). Smith, however, argues he was a Chrysler franchisee and his termination was in violation of federal laws which require a franchisor to act in good faith when terminating a dealership, 15 U.S.C. § 1222, and in violation of Arizona law, which requires a franchisor to provide notice to the Arizona Department of Transportation and show good cause for terminating the franchise, A.R.S. §§ 28-4453(D); 28-4457.

To challenge his termination, Smith first lodged a petition with the Arizona Department of Transportation, entitled "Petition to Enforce Dealer Franchise Laws and Request for Hearing."  (Doc. 21, Exb. G)  The Arizona Department of Transportation responded by saying it lacked authority to preside over an administrative hearing in the matter.  (Doc. 21, Exb. H).  Smith next submitted a petition for reconsideration, which was denied, as the Administrative Law Judge concluded the dispute appeared "to be a wrongful termination suit as opposed to [one for] franchise or dealer violations" and that

1    the Arizona Department of Transportation did not have jurisdiction over Smith's claims.

2    (Doc. 21, Exb. J).  Smith then filed this action.

3          In his First Amended Complaint (Doc. 19), Smith alleges Chrysler violated the

4    Automobile Dealers' Day in Court Act (Count I), he is entitled to seek a declaratory

5    judgment as to his franchisee status under Arizona and federal law (Count II), he is

6    entitled to seek a declaratory judgment that he was a person in a "bona fide relationship"

7    with Chrysler under Arizona law (Count III), he is owed civil damages pursuant to A.R.S.

8    § 28-4307 due to Chrysler's alleged illegal ownership interest in the Dealership (Count

9    IV), he is owed civil damages pursuant to A.R.S. § 28-4307 for Chrysler's failure to

10   provide notice and show good cause for his terminations (Count V), Chrysler tortuously

11   interfered with his contract and business expectancy with the Dealership (Count VI), and

12   Chrysler committed breach of contract and breach of the implied covenant of good faith

13   and fair dealing (Count VII).  Chrysler moves to dismiss Counts I, II, III, IV, VI, and VII

14   under Rule 12(b)(6), Federal Rules of Civil Procedure.  (Doc. 21).

**II.     RULE 12(b)(6), FEDERAL RULES OF CIVIL PROCEDURE**

15         A motion to dismiss challenges the legal sufficiency of the plaintiff's pleadings.

16   Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on

17   "the lack of  a cognizable legal theory" or "the absence of sufficient facts alleged under a

18   cognizable legal theory."  *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699

19   (9th Cir. 1990).  To avoid dismissal, a complaint need include "only enough facts to state

20   a claim for relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

21   544, 570 (2007).

22         On a motion to dismiss under Rule 12(b)(6), all allegations of material fact are

23   assumed to be true and construed in the light most favorable to the non-moving party.

24   *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  "Threadbare recitals of the

25   elements of a cause of action, supported by mere conclusory statements, do not suffice."

26   *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009).  *Id.*  "A claim has facial plausibility when

27   the plaintiff pleads factual content that allows the court to draw the reasonable inference

28   that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To show that the plaintiff is entitled to relief, the complaint must permit the court to infer more than the mere possibility of misconduct. *Id.* If the plaintiff's pleadings fall short of this standard, dismissal is appropriate.

### III.    COUNTS I, II, IV, AND VI: SMITH'S STATUS AS A FRANCHISEE

Defendant Chrysler Group LLC contends Counts I, II, IV, and V of Smith's Amended Complaint (Doc. 19) must be dismissed because Plaintiff is not an "automobile dealer" or "franchisee" as defined under federal or Arizona law and therefore lacks standing. Smith responds that the intertwining of stock acquisitions by Smith from Chrysler with bonuses paid from the Dealership to Smith and the Sales and Service Agreement executed by Smith on behalf of the dealership created a web of integrated agreements that, taken together, establish a franchise between Smith and Chrysler. (Doc. 19, ¶ 36).

#### A.    Smith's Status as a Dealer under Federal Law

The Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221–1225, "is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." *Maschio v. Prestige Motors,* 37 F.3d 908, 910 (3d Cir. 1994). It permits automobile dealers to sue manufacturers for their failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. Under the statute, an automobile dealer is defined as "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). A franchise is "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or

contract." *Id*. at (b).

To have standing to sue Chrysler under the ADDCA, Smith must be an automobile dealer.  To be an automobile dealer, Smith must have been "operating under the terms of a franchise."  15 U.S.C. § 1221(c).  According to Chrysler, the franchise agreement in this action was the Sales and Service Agreement, which was executed by the Dealership and not by Smith.  It follows, Chrysler argues, that only the Dealership, or someone suing on behalf of the Dealership, is eligible to bring suit under the ADDCA, meaning Smith has no right to bring this suit as an individual.  Smith, however, asserts that although he may not be a direct party to what Chrysler labels the franchise agreement, taken as a whole, his relationship with Chrysler constituted a franchise.  To support his claim, he points to a more expansive reading of the ADDCA that grants standing to plaintiffs who, like him, have no ability to sue on behalf of the franchised dealership but whose financing and management arrangements with the manufacturer combine to resemble a franchise in substance.

Smith is correct in his assertion that some courts have granted standing under the ADDCA to individuals party to agreements that amount to a franchise in substance, if not form.  These courts have permitted individuals who were deemed essential to the operation of the dealership, but party to financing agreements that prevented them from suing on behalf of the franchised dealership, to bring suit on behalf of themselves.  *See, e.g.*, *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 716-17 (7th Cir. 1965) (granting standing to an individual shareholder in a dealership who was deemed essential to its operation but had no power to sue on behalf of the dealership); *see also Lewis v. Chrysler Motors Corp.*, 456 F.2d 605, 607 (8th Cir. 1972) (noting that "the term automobile dealer is to be given the construction that best serves the congressional purpose of supplementing the antitrust laws, and balancing the power heavily weighted in favor of automobile manufacturers") (internal quotations and citations omitted).

Other courts, however, have rejected the idea that individuals who have an ownership interest in the dealership, but who are not party to the franchise agreement,

have standing under the ADDCA.   *See, e.g.*, *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp. 2d 233, 243 (S.D.N.Y. 2002) (noting that the Second Circuit "firmly rejected individual standing, at least where . . . the individual shareholder sues only in his own behalf, and not, as in *York Chrysler–Plymouth,* alongside the corporate franchisee itself"); *Pearson v. Ford Motor Co.*, 68 F.3d 1301, 1303 (11th Cir. 1995) (finding that a plaintiff with a minority stock interest in a dealership who was not "inextricably woven into the franchise agreement" had no standing to sue under the ADDCA).

In general, the inquiry into whether an individual not party to the ostensible franchise agreement has standing requires a fact-intensive examination of the entire transaction.   In the leading Seventh Circuit case, *Kavanaugh*, a contract between the plaintiff Kavanaugh and Ford Motors provided for the formation of a corporation to carry out the business of the automobile dealership, with Kavanaugh designated as the dealership's operator.  *Kavanaugh*, 353 F.2d. at 712.   The dealership was financed such that Ford retained all voting stock.  *Id.*  Kavanaugh was required to purchase dealership stock from Ford with a percentage of his annual bonus but could not acquire voting rights in the corporation until Ford had relinquished all of its preferred stock ownership.  *Id.* The stock agreement also called for a management contract to be executed between Kavanaugh and the dealership and a sales contract to be executed by Ford and the dealership.  *Id.* at 713.  The contract was terminable at-will by either party, and when sales at the dealership began to decline, Ford terminated the contract, determined Kavanaugh's stock was worthless, and paid him one dollar for his ownership interest in the dealership.  *Id.* at 715.

As in this action, Kavanaugh brought suit under the ADDCA and the manufacturer, Ford, countered that Kavanaugh had no standing under the Act because he was not a party to the franchise agreement, which Ford asserted was the sales agreement between itself and the dealership.  *Id.* at 713.  The Seventh Circuit determined that the formation, sales, and management contracts should be read together as an integrated agreement between Kavanaugh and Ford, holding that if "other written agreements are so

interwoven with the document ostensibly designated as the franchise as to affect materially the legal significance of the latter, they must be regarded as part of the franchise agreement." *Id*. at 715. The court went on to conclude that Kavanaugh had applied to Ford for a dealership as an individual, not on behalf of a corporation, that the agreement between Ford and Kavanaugh emphasized Kavanaugh's importance to the transaction, and that it was obvious from the contracts that "Kavanaugh was deemed essential to the operation of the dealership." *Id*. at 716. Furthermore, with Ford retaining all voting stock in the corporation, there was no way for the dealership to bring suit under the act, as Ford was unlikely to sue itself. *Id*. at 717. The court examined the history and purpose of the ADDCA and noted that:

> The position of the dealer had been such that his "franchise" agreement with the manufacturer was little short of illusory. . . . It is settled doctrine that the fiction of corporate entity will be disregarded whenever it has been adopted or used to evade the provisions of a statute. *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 437 (1946); *United States v. Lehigh Valley R.R. Co.*, 220 U.S. 257, 272 (1911); *Metropolitan Holding Co. v. Snyder*, 79 F.2d 263, 266 (8th Cir. 1935). . . . For the reasons we have demonstrated, the Dealers' Day in Court Act would be subverted in the instant case if the corporate format adopted by the parties were given recognition. Hence, we must 'pierce the veil' of the corporate entity and look to the substance and reality of the situation. In the interest of justice, the corporate fiction must be ignored.

*Kavanaugh*, 353 F.2d at 717. The court went on to conclude that Kavanaugh was an automobile dealer operating under the terms of a franchise agreement within the meaning of the ADDCA. *Id*. at 718.

Chrysler suggests the leading Ninth Circuit case interpreting standing under the ADDCA, *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429 (9th Cir. 1979), expressly rejects *Kavanaugh*. But *Sherman* did not reject *Kavanaugh*, it found *Kavanaugh* inapplicable on its facts. In *Sherman*, the plaintiff brought suit under the ADDCA on behalf of himself and the corporation dealership, of which he was president and sole shareholder. 601 F.2d at 435. Only the dealership was party to the actual

franchise agreement.  *Id.*  The Ninth Circuit held that the plaintiff could not sue under the ADDCA on behalf of himself because, even though the franchisor "recognized the importance of [the plaintiff's] services and those of his wife to the corporation," it was not enough to "warrant departure from the general rule of separation of identities, nor afford Sherman standing to bring suit in his individual capacity as a shareholder or creditor on any of the claims asserted [under the ADDCA]."  *Id.* at 439-40.  The *Sherman* court noted, in a footnote, that it found *Kavanaugh*'s analysis inapplicable because its facts were distinguishable.  *Id.* at 440 n.11.

Sherman did, however, expressly disagree with a Fifth Circuit case granting standing to an individual not party to a franchise agreement.  601 F.2d at 440 n.11 (citing *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir. 1971)).  In *York Chrysler-Plymouth*, the Fifth Circuit granted standing to the individual owners of a dealership, in addition to the dealership, finding that the individual owners "were made essential to the operation of the dealership by agreement with Chrysler Motors."  *Id.* at 790.  *York*, however, provides little explanation or analysis of the contracts entered into by the individual owners and the dealership and concluded the individual owners were entitled to sue under the ADDCA because Chrysler has vested the individual owners with "personal responsibility for keeping the franchise viable."  *Id.* at 791.  *Sherman* disagreed with the holding in *York*, noting the provision "that if certain stockholders did not continue as principals in the business the dealership could be terminated by the franchisor, was for the benefit of the latter only and did not expand the parties to the agreement."  *Sherman*, 601 F.2d at 440 n.11.  The *Sherman* court concluded that claiming an individual is integral to a franchise agreement is not, on its own, enough to grant standing under the ADDCA.  *Id.* at 441.

But *Sherman* did not foreclose on the possibility that certain facts may warrant a departure from the general rule that only parties to the franchise agreement have standing under the ADDCA.  Instead, the court found that Sherman's role as president and sole shareholder, as well as the franchisor's recognition of Sherman's importance to the dealership, was not enough to warrant blending the individual and corporate identities.

*Sherman*, 601 F.2d at 440.  A key distinction between *Sherman* and this action is that the plaintiff in *Sherman* was the sole shareholder of the dealership, meaning he was able to assert claims under the ADDCA on behalf of the dealership.  He was not a party to an investment contract that stripped him of voting power.

Here, Smith's claims are more akin to *Kavanaugh*, as Smith is unable to bring a claim on behalf of the Dealership because Chrysler controls all of the Dealership's voting stock.  No precedent in the Ninth Circuit limits our inquiry into Smith's franchisee status to the four corners of the contract Chrysler asserts is the franchise agreement. Accordingly, to decide whether Smith is a franchisee for the purposes of the ADDCA, we must look not only at the language in all the relevant contracts but also at the economic substance of the entire transaction to determine whether the separate agreements are so inexorably linked that, together, they establish a franchise between Chrysler and Smith.

On the pleadings, Smith has alleged sufficient facts to suggest that the contracts between Smith and Chrysler, Chrysler and the Dealership, and the Dealership and Smith are interrelated and can be read in combination as forming a franchise between Smith and Chrysler.  The Bonus Agreement, for example, was executed by Smith and the Dealership but gives Chrysler the right to terminate Smith.  (Doc. 21, Exb. D). The Sales and Service Agreements recognize that Smith is an integral part of the franchise whose "abilities, expertise, knowledge and integrity" are material to Chrysler and acknowledge Chrysler's reliance on Smith's "substantial continuing personal participation in the management of" the Dealership.  (Doc. 21, Exb. E).

Smith also alleges facts which suggest that, in his role as General Manager, he undertook many of the responsibilities of a franchised dealer, including negotiating financing arrangements with lenders to stock the Dealership and abiding by Chrysler's franchise terms and conditions.  Finally, Smith alleges that Chrysler partially owns, and completely controls, the Dealership and that Chrysler cannot or will not assert a claim against itself on behalf of the Dealership.   Determining whether Smith is an automobile dealer for the purposes of the ADDCA will require a fact-intensive inquiry that is not amenable to resolution on the pleadings.  For now, Smith has alleged facts sufficient to

1    survive a motion to dismiss.  Chrysler's Motion to Dismiss Count I on the grounds that

2    Smith lacks standing under the ADDCA will be denied.

3        **B.    Count II - Smith's Status under Arizona Law**

4        Chrysler next moves to dismiss Smith's claims under the Arizona statute

5    governing automobile franchises, arguing that Smith is not a franchisee as defined by

6    Arizona law.  Smith asserts that, with there being no cases interpreting who qualifies as a

7    franchisee under Arizona's law, the same analysis applied to the federal law should be

8    applied to infer that he is a franchisee under the Arizona statute.

9        Arizona regulates the termination of automobile dealer franchises by requiring a

10   franchisor to notify the franchisee and the director of the Arizona Department of

11   Transportation of its intention to terminate a franchise.  A.R.S. § 28-4453(D).  Arizona

12   also requires a franchisor to show "good cause" for termination or nonrenewal of a

13   franchise, A.R.S. § 28-4452(A), and provides for a hearing with Arizona Department of

14   Transportation on the issue, A.R.S. § 28-4456.  Chrysler did not notify Smith or the

15   Arizona Department of Transportation of its intention to terminate Smith, so when Smith

16   discovered he had been terminated, he petitioned Arizona Department of Transportation

17   for a hearing.  Arizona Department of Transportation labeled Smith "a franchisee for

18   Superstition Springs Chrysler Jeep Dodge," but denied Smith's request for a hearing on

19   the grounds that it appeared to reflect a wrongful termination suit as opposed to a suit

20   involving franchise or dealer operations.  (Doc. 21, Exb. J). Chrysler argues this Court

21   should adhere to the Arizona Department of Transportation's determination that Smith's

22   claims do not involve violations of Arizona's automobile dealer franchise laws.

23       But this action is not an appeal from an administrative determination and no

24   deference is owed to the Arizona Department of Transportation's findings.  Furthermore,

25   the Arizona Department of Transportation's ruling focused on an arbitration clause,

26

27

28

which neither party seeks to enforce,[1] and provided little discussion as to why it concluded that Smith was protesting the termination of his employment rather than the termination of the franchise. (Doc. 21, Exb. J).

Arizona law defines a franchisee as "a person who both: (a) Receives new motor vehicles from the franchisor under a franchise [and] (b) Offers and sells to and services new motor vehicles for the general public." A.R.S. § 28-4301(13). Smith must be a franchisee to have standing under Arizona's dealership statutes. A.R.S. § 28-4307.

Arizona's automobile dealer franchise law differs from its federal analog in that it anticipates financing arrangements like the Stock Agreement entered into by Smith and Chrysler. Although manufacturers are generally prohibited from owning dealerships in Arizona, manufacturers are permitted to own a dealership if they are in a bona fide relationship with a qualified person who makes "a substantial unencumbered bona fide initial investment in the dealership that is reasonable and consistent with standard business practices." A.R.S. § 28-4460(B)(1)(b). That person must be given the opportunity to acquire "substantial portions of the factory's remaining ownership interest in substantial regular periodic payments throughout the acquisition period." *Id.*

Chrysler suggests that, under this statute, Smith is somehow prohibited from being both a franchisee and a "qualified person in a bona fide relationship" with Chrysler. Nothing in the statutory scheme supports this reading. The statute is designed to prevent a manufacturer from unfairly competing with its dealers and outlines the few circumstances under which it is acceptable for a manufacturer to hold an ownership interest in its own franchise. *Id.* at (A), (B). Although the statute contemplates that the manufacturer may hold an ownership interest in a dealership and provides for some protections to a person in a "bona fide relationship" with the owner-manufacturer, it does

---

[1] The Sales and Service Agreement executed by the Dealership and Chrysler contains a binding arbitration clause. Both Arizona and federal law invalidate binding arbitration provisions in automobile dealer franchise agreements. *See* A.R.S. § 28-4453 (requiring that arbitration must be voluntarily submitted to by the franchisee according to a "plan established by the franchisor"); 15 U.S.C. § 1226(a)(2) (requiring separate consent in writing to arbitrate after a dispute arises, notwithstanding any arbitration clause in a franchise agreement).

not limit the ability of the person in a bona fide relationship to become a franchisee as he or she acquires ownership in the dealership.   Whether the person in a bona fide relationship is a franchisee depends on the nature of the relationship as defined by the contracts between the parties.

Because no cases interpret the definition of a franchisee under Arizona's dealership franchise statute and the definition of a franchisee under Arizona law is substantially similar to the ADDCA, we rely on cases interpreting the ADDCA guide the determination of Smith rights under Arizona law.  *See Sell v. Gama*, 231 Ariz. 327, 327 ¶ 18, 295 P.3d 421, 425 (2013) (holding that Arizona will defer to federal case law construing a parallel federal statute unless there is a good reason to depart from the federal decisions).   Smith has alleged facts sufficient to survive a motion to dismiss challenging his status and right to sue as an automobile dealer under federal law.   *See* Section III.A, *supra*.   It follows that, at this stage in the pleadings, Smith has alleged facts sufficient to support a plausible claim that he has standing under Arizona's dealership franchise statute.   Chrysler's Motion to Dismiss Count I will be denied.

## IV.   COUNTS II AND III – DECLARATORY JUDGMENT

Under Counts II and III, Smith seeks a declaratory judgment that he is an automobile dealer under federal and Arizona law and that he is person in a bona fide relationship with Chrysler under Arizona law.   Chrysler moves to dismiss these Counts, arguing Smith is not entitled to seek a declaratory judgment because his "claims as to his alleged franchisee status are based on circumstances that no longer exist, namely, his position as the Dealership's General Manager, and his rights under the Bonus and Stock Agreements," which have been terminated.   (Doc. 21, Pg. 13).   Smith asserts that declaratory relief is necessary and proper because if he is a franchisee or person in a "bona fide relationship" with Chrysler under Arizona law, then Arizona law trumps the at-will employment clause in his contract and prohibits Chrysler from terminating his ownership interest in the dealership without good cause.   *See* A.R.S. § 28-4457 ("Notwithstanding the terms, provisions or conditions of an agreement or franchise," a franchisor may not terminate a franchise absent "good cause"); *cf.* A.R.S. § 28-

4460(B)(1)(b)(vi) ("The qualified person can expect to acquire and retain full and complete ownership of the dealership within a reasonable period of time that is not longer than ten years and on reasonable terms and conditions that are consistent with standard business practices."). Under federal law, if Smith is a franchisee, Chrysler was required to act in good faith when terminating his franchise. 15 U.S.C. § 1222.

A party whose "rights, status, or other legal relations" are impacted by a statute or contract may petition the courts for declaratory judgment. A.R.S. § 12-1832. Arizona's declaratory judgment act is "remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered." *Id*. "No proceeding will lie under the declaratory judgment acts to obtain a judgment which is advisory only or which merely answers a moot or abstract question." *Ariz. State Bd. of Directors v. Phoenix Union High Sch. Dist.*, 102 Ariz. 69, 73, 424 P.2d 819, 823 (1967). Federal law also recognizes that the "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (internal quotations and citations omitted).

Smith seeks to have his status declared under Arizona law, federal law, and a contract. The controversy is not moot, as Chrysler suggests, because if Smith is a franchisee, Smith's termination may have violated his statutory rights. Smith has alleged facts sufficient to show that his status as a franchisee is an existing controversy that significantly impacts his legal rights. Chrysler's Motion to Dismiss Counts II and III will be denied.

## V.   COUNT VI: TORTIOUS INTERFERNCE WITH CONTRACT AND BUSINESS EXPECTANCY

Chrysler argues Smith's tortious interference with contract claim, which alleges that Chrysler tortuously interfered with the Bonus Agreement and with Smith's business

expectancy of acquiring full ownership of the Dealership, is legally deficient. Specifically, Chrysler asserts it cannot be held liable for tortious interference because, as a general rule, a party cannot be held liable for tortious interference with its own contract or business relationship. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 493 n.19, 38 P.3d 12, 31 n.19 (2002).

Chrysler is not a stranger to Smith's business relationship with the Dealership. Chrysler owns all voting stock in the Dealership and has a strong interest in Dealership's success. An entity that is directly interested or involved in a business relationship is not generally liable for any harm resulting from its pursuing its own interests. *See Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 832 (9th Cir. 2001) (noting that under California law, which largely parallels Arizona law on tortious interference, "the core of intentional interference with business torts is interference with an economic relationship by a third-party *stranger* to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests"). Because Chrysler is an integral part of both Smith and the Dealership's business, it cannot be liable for tortious interference with Smith's business expectancy in the Dealership. Chrysler's Motion to Dismiss Smith's tortious interference with business expectancy claim will be granted.

Chrysler, however, is not a party to the Bonus Agreement. Although the Bonus Agreement gave Chrysler the right to exercise rights as a Dealership stockholder and remove Smith as a director and employee, Chrysler did not execute the agreement and is, at most, a third-party beneficiary of the contract. Arizona does not insulate third-party beneficiaries from liability for tortious interference with contract. *See Wells Fargo Bank*, 201 Ariz. at 493 n.19, 38 P.3d at 31 n.19 (holding that a tortious interference with contract claim could proceed against a defendant who was a third-party beneficiary of the contract).

Having established Chrysler is not a party to the Bonus Agreement, to prevail on his tortious interference claim, Smith must allege facts that plausibly establish "the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, the interference must be improper as to motive or means before liability will attach." *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427, 909 P.2d 486, 494 (Ct. App. 1995).

Smith has successfully shown the existence of a contractual relationship with the Dealership (the Bonus Agreement), and Chrysler has admitted in its Motion to Dismiss that it had knowledge of the agreement.  Smith argues that Chrysler tortuously interfered with his contract by terminating him his relationship with the Dealership under the Bonus Agreement in violation of both federal and Arizona law.  But Chrysler fired Smith in accordance with the terms of the Bonus Agreement.  Although Chrysler intentionally caused the termination of Smith's contractual relationship with the Dealership, it cannot be said that Chrysler tortuously interfered with the contract when it exercised a power expressly granted to it by the contract.  Even if the termination provision is unenforceable under federal and Arizona law, an action does not lie for tortious interference with contract.  Chrysler's Motion to Dismiss Count VI will be granted.

## VI.    COUNT VII - BREACH OF CONTRACT AND THE IMPLIED COVENANT

Chrysler moves to dismiss Smith's claims for breach of contract and breach of the implied covenant of good faith and fair dealing arising out of the Stock Agreement. Per the contract's choice of law provision, the Stock Agreement is governed by Michigan law.  (Doc. 21, Exb. C).

Smith alleges Chrysler breached the express terms of the Stock Agreement and the implied covenant of good faith and fair dealing when Chrysler relied on illegal and

unenforceable contract provisions to remove him from the Board of Directors and terminate him as General Manager. (Doc. 19, ¶ 137-138). Smith asserts that he had a valid expectation that the Stock Agreement would be executed in a manner that complied with state and federal law, meaning Chrysler would give him notice and a chance to be heard before terminating him. (Doc. 22). He also argues that the "provision of the Bonus Agreement and the Stock Agreement permitting Chrysler unfettered discretion to remove [him] as General Manager and terminate [his] franchise are unenforceable because they are unconscionable and they violate [his] reasonable expectations." (Doc. 19, ¶ 131).

At the outset, it must be determined whether Arizona law permits a franchisee to waive his statutory right to be terminated only for good cause. *See Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 267 ¶ 10, 77 P.3d 439, 442 (2003) (holding that "whether the disputed issue is one which the parties could have resolved by an explicit provision in their agreement" is a question for the forum state). A.R.S. § 28-4452(A) provides, "Notwithstanding the terms, provisions or conditions of an agreement or franchise, a franchisor shall not cancel, terminate or refuse to renew a franchise unless the franchisor has good cause for termination or nonrenewal." A.R.S. § 28-4452(A). If Smith is a franchisee, the parties were not permitted to contract for termination at-will.

Smith's remedy, however, does not lie in an action for breach of the express contract terms. Under the Stock Agreement, Chrysler was entitled to use its "voting power to remove [Smith] as Director and to cause his remove as General Manger of [the Dealership]." (Doc. 19, ¶ 133). In removing Smith, Chrysler exercised the power it was granted in the contract. To the extent that Chrysler executed on an invalid or illegal contract provision, the contract would be void not breached. *Cf. E & S Insulation Co. of Ariz., Inc. v. E. L. Jones Const. Co*., 121 Ariz. 468, 470, 591 P.2d 560, 562 (Ct. App. 1979) (noting that a contract which cannot be performed without violating applicable law is illegal and void). Smith may be correct that portions of the agreement violated federal or Arizona law, but that gives rise to a statutory remedy and not to a claim that Chrysler violated the express terms of the contract. Chrysler's Motion to Dismiss Smith's claims

- 18 -

1   for breach of the express terms of the contract will be granted, but Smith's claims that the

2   contract, or portions of it, is void will be preserved.

3        Smith's independent claim for breach of the implied covenant of good faith and

4   fair dealing, however, will survive.  Chrysler argues no action can lie for the breach of

5   the implied covenant of good faith and fair dealing because Michigan law does not

6   recognize a separate cause of action for the breach of that implied covenant.  *Fodale v.*

7   *Waste Management of Mich., Inc.*, 271 Mich.App. 11, 35, 718 N.W.2d 827, 841 (2006).

8   But "Michigan recognizes that an enforceable implied covenant of good faith and fair

9   dealing arises when one party to a contract makes its performance a matter of its own

10   discretion." *Bd. of Trustees of City of Birmingham Employees' Ret. Sys. v. Comerica*

11   *Bank*, 767 F. Supp. 2d 793, 805 (E.D. Mich. 2011) (citing *Stephenson v. Allstate Ins. Co.,*

12   328 F.3d 822, 826 (6th Cir.2003) (applying Michigan law)); *Burkhardt v. City Nat'l.*

13   *Bank of Detroit*, 57 Mich.App. 649, 652, 226 N.W.2d 678, 680 (1975).   By giving itself

14   the unfettered right to terminate Smith, Chrysler made its performance a matter of its own

15   discretion and triggered the protections implied covenant under Michigan law.

16        Even if Michigan did not recognize a cause of action for breach of the implied

17   covenant of good faith and fair dealing in this case, Arizona would.  "Arizona law

18   implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v.*

19   *Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*,

20   201 Ariz. 474, 490 ¶ 59, 38 P.3d 12, 28 (Ariz. 2002).  Arizona, as the forum state, has a

21   strong interest in ensuring parties who enter into contracts in Arizona receive the benefits

22   of the implied covenant.  The Court need not decide at this time whether Arizona law

23   would govern in place of the Michigan choice of law clause.  Chrysler's Motion to

24   Dismiss Smith's claims for breach of the implied covenant of good faith and fair dealing

25   will be denied.

26        IT IS THEREFORE ORDERED that Defendant Chrysler Group, LLC's Motion to

27   Dismiss (Doc. 21) will be granted in part and denied in part.

28

IT IS FURTHER ORDERED that Plaintiff Alfonzo Smith's claims for tortious interference with contract and business expectancy (Count VI) and for breach of the express contract terms (Count VII, in part) from his First Amended Complaint (Doc. 19) are dismissed with prejudice.

Dated this 18th day of April, 2014.

Neil V. Wake
United States District Judge