**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alfonzo Smith, | No. CV-13-01732-PHX-NVW |
| Plaintiff / Counter-Defendant, | **ORDER** |
| v. | |
| FCA US LLC, | |
| Defendant / Counter-Plaintiff. | |

## TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………..…….   1

II.     LEGAL STANDARD……………………….…………….……..…….   1

III.    MATERIAL FACTS…………………...…………….....….   2

     A.  Smith's Relationship with Chrysler Before Arizona………………   2

     B.  Smith's Relationship with Chrysler in Arizona:  Contracts and
         Policies…………………………………………….……..…   3

         1.  Contract between Chrysler and the Arizona dealership……….   3

         2.  Contract between the Arizona dealership and Smith…….……   4

         3.  Contract between Chrysler and Smith…………………….……   5

         4.  Managerial policies………………………………….……   6

     C.  Smith's Relationship with Chrysler in Arizona:  the Circumstances..…   6

      D.  Smith's Response to Termination……………………………………..  8

IV.     ANALYSIS……………………………………………..…..……….....  8

      A.  Dealer or No Dealer…………………………………….……......  10

          1.  Determination of dealer status is not formalistic…………..…….  11

          2.  The touchstone inquiry here is whether Smith was deemed
             essential to the dealership's operation………………..…......  13

             a.  Smith applied for the dealership as an individual……...  14

             b.  Chrysler entered into the arrangement with the
                dealership in reliance on Smith's role…………………  14

             c.  At termination, Smith was a long-time manager and
                majority shareholder……………………………………..…  16

             d. Without Smith, Chrysler's arrangement with the
                dealership would have been illegal………………..……..  16

      B.  Duty of Good Faith Under the Federal Dealers' Act…..……………  17

      C.  Requirements Under the Arizona Statutes……………………………  19

          1.  Notice and ensuing procedural rights…………………………  19

          2.  Chrysler's ownership interest in the dealership……………..…  19

      D.  Common-Law Duty of Good Faith and Fair Dealing………………..  21

      E.  Declaratory Judgment……………………………………..…..  22

Before the Court are Plaintiff's Motion for Summary Judgment on Liability (Doc. 165), Defendant's Motion for Summary Judgment (Doc. 134), and the parties' accompanying statements of facts and briefs.[1]  For the reasons that follow, Plaintiff's motion will be granted in part and denied in part, and Defendant's motion will be denied.

## I.     INTRODUCTION

In 2002, Alfonzo Smith became general manager and part owner of a Chrysler-brand dealership.  Chrysler owned the rest of the dealership's stock.  Smith and Chrysler agreed that Smith would gradually purchase the remaining stock from Chrysler, so that he could become the dealership's full owner.  Chrysler retained all voting rights in the dealership until Smith purchased all the stock.

In 2012, Chrysler terminated Smith's involvement in the dealership.  Smith had acquired most, but not all, of the dealership's stock.

Smith claims Chrysler's termination violated the common-law duty of good faith and fair dealing as well as federal and state statutes protecting automobile dealers.[2]  Chrysler claims there was no bad faith and that the statutes protecting automobile dealers do not apply to Smith.  Both parties seek summary judgment.

## II.     LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial.  Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that

---

[1] Many documents in this case, including Plaintiff's Motion, have been filed under seal to protect confidential information.

[2] After Smith filed this action, Defendant changed its name from Chrysler Group LLC to FCA US LLC.  (Doc. 70.)  Because all relevant events occurred before this name change, Defendant will be referred to as "Chrysler" throughout this order.

1    a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

2    *Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3         The movant has the burden of showing the absence of genuine disputes of material

4    fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant shows

5    an absence of evidence to support the nonmoving party's case, the burden shifts to the party

6    resisting the motion. The party opposing summary judgment must then "set forth specific

7    facts showing that there is a genuine issue for trial" and may not rest upon the pleadings.

8    *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than

9    simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec.*

10   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

11        In deciding a motion for summary judgment, the Court must view the evidence in the

12   light most favorable to the nonmoving party, must not weigh the evidence or assess its

13   credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves*

14   *v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.

15   Where the record, taken as a whole, could not lead a rational trier of fact to find for the

16   nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

17

18   **III.   MATERIAL FACTS**

19        The following facts are drawn from Plaintiff's Statement of Facts and exhibits

20   (Doc. 166), Defendant's Statement of Facts and exhibits (Docs. 135, 150, 151, 152), and

21   the parties' pleadings (Docs. 19, 48, 50.). The facts are undisputed except where

22   otherwise noted.

23        **A.    Smith's Relationship with Chrysler Before Arizona**

24        In 1981, Smith acquired a Chrysler-brand dealership in Virginia. (Doc. 135 at

25   ¶ 9.) He paid for the acquisition himself, after borrowing money and selling personal

26   assets. (*Id.* at ¶ 10.) He was the dealership's sole owner. (*Id.* at ¶ 13.)

27        In 1984 or 1985, Smith decided he wanted a larger Chrysler-brand dealership in

28   Virginia. (*Id.* at ¶¶ 14-15.) Rather than pay for the acquisition himself, he used

Chrysler's "Marketing Investment" program.  (*Id.* at ¶¶ 16-17.)   Under the program, Smith contributed 25% of the required capital, while Chrysler contributed the remaining 75%.  (*Id.* at ¶ 18.)   Smith acquired common stock in the dealership, and Chrysler controlled the voting stock.  (*Id.* at ¶¶ 21-22.)

**B.     Smith's Relationship with Chrysler in Arizona: Contracts and Policies**

In 2002, Smith took advantage of the Marketing Investment program again, this time in an effort to acquire a Chrysler-brand dealership in Arizona named Superstition Springs Chrysler Jeep Inc. ("the Arizona dealership").  (Doc. 166 at ¶¶ 2-4.)

To apply, Smith submitted an "Application for Dealer Agreement" to Chrysler on March 25, 2002.  (Doc. 166-2.)  On the application Smith provided personal information such as his name, education, business experience, references, financial assets and liabilities, and credit score.  (*Id.* at 2-5, 8.)  In response to the question of who would manage the proposed dealership, he wrote "I will, Alfonzo Smith."  (*Id.* at 5.)  Upon receipt of Smith's application form, Chrysler's National Dealer Placement Manager requested a "Dealer Background Report" on Smith.  (*Id.* at 28.)

At some point Smith also sent to Chrysler a form letter asking to be employed as the Arizona dealership's General Manager.  (Doc. 135-14.)  There is no date on the letter.  (*Id.*)  The parties dispute whether this letter was sent during the application process or after Smith had already entered the Marketing Investment program.  (*Compare* Doc. 135 at ¶ 32 *with* Doc. 168 at ¶ 32.)

In any event, Chrysler accepted Smith's application.  (Doc. 166 at ¶ 4.)  The resulting arrangement between Chrysler and Smith was created by three sets of contracts. Smith's managerial role at the Arizona dealership was governed by more specific policies.

**1.     Contract between Chrysler and the Arizona dealership**

The first contract was executed by Chrysler and the Arizona dealership on June 5, 2002.  (Doc. 135-16.)  It lists Chrysler and Smith as the dealership's shareholders.  (*Id.* at 3, 7.)  It assigns Chrysler the dealership's voting stock and assigns Smith the dealership's

non-voting stock.  (*Id.*)  It ensures "there will be no change affecting more than 50% of the ownership interest," nor any change in ownership interest which may affect the dealership's "managerial control," without Chrysler's "prior written approval."  (*Id.*)

The contract also lists Smith and one other employee as the dealership's managers. (*Id.* at 2, 6.)  It labels Smith "General Manager" and the other employee "President." (*Id.*)  It states Chrysler "has entered into this Agreement relying on the active, substantial and continuing personal participation" of these managers and prevents the dealership from changing management "personnel" or "the nature and extent of [their] management participation" without Chrysler's "prior written approval."  (*Id.* at 2-3, 6-7.)

The contract's introduction states Chrysler "has entered into this Agreement in reliance upon and has placed its trust in the personal abilities, expertise, knowledge and integrity of [the dealership's] principal owners and management personnel, which [Chrysler] anticipates will enable [the dealership] to perform the personal services contemplated by the Agreement."  (*Id.* at 2, 6.)  Throughout the contract, the Arizona dealership is referred to as "DEALER."  (*Id.*)

A newer version of the contract was executed in 2009.  (Doc. 135-17.)  The provisions are materially identical.  (*Compare* Doc. 135-16 *with* Doc. 135-17.)  The 2009 version contains what appears to be a typographical error, listing Smith as owning the voting stock and Chrysler as owning the non-voting stock.  (Doc. 135-17 at 3, 7, 11.)

**2.      Contract between the Arizona dealership and Smith**

The second contract was executed by the Arizona dealership and Smith on June 11, 2002.  (Doc. 135-18.)  It provides that the dealership will pay Smith a salary, set by the dealership's Board of Directors, as well as an annual bonus of 25% of the dealership's annual profit.  (*Id.* at 2-3.)

The contract also contains an at-will employment clause.  (*Id.* at 4.)  The clause states that Chrysler has the "absolute right," as the dealership's sole voting stockholder, to remove Smith as a Director and employee of the dealership.  (*Id.*)  Smith signed his initials next to this clause and signed at the end of the contract.  (*Id.*)

- 4 -

A newer version of the contract was executed in 2003.  (*Id.* at 6-8.)  The provisions are materially identical.  (*Compare* Doc. 135-18 at 2-4 *with* Doc. 135-18 at 6-8.)

### 3.      Contract between Chrysler and Smith

The third contract was executed by Chrysler and Smith on June 11, 2002.  (Doc. 135-19.)  It states Chrysler purchased 9,500 voting shares in the dealership for $950,000 and Smith purchased 500 non-voting shares in the dealership for $50,000.  (*Id.* at 2.)

The contract requires Smith to spend at least half of, and no more than, his annual bonus each year to purchase Chrysler's shares at a price of $100 per share.  (*Id.* at 3.)  It further provides that once Smith buys a share from Chrysler, the share becomes non-voting; thus, as long as Chrysler has any shares, it has the only voting shares.  (*Id.* at 3, 7.)  It also prohibits Chrysler from issuing or converting additional shares.  (*Id.* at 7.)

The contract further provides that if Smith ceases to be General Manager for any reason, his rights to purchase stock will terminate and Chrysler will either (1) buy back Smith's then-acquired stock at book value or (2) dissolve the dealership, liquidate its assets, and distribute the proceeds to the shareholders.  (*Id.* at 3-4.)  The last page of the contract contains a Michigan choice-of-law clause.  (*Id.* at 10.)

A newer version of the contract was executed on September 30, 2003.  (*Id.* at 11-24.)  According to a letter from Chrysler to Smith dated September 18, 2003, the newer version was necessary because Smith had acquired 25% of the dealership's total equity.  (Doc. 166-3 at 2.)  Thus, the 2003 version of the contract contains revised figures on the shares owned by the respective parties:  Chrysler owned 9,583 voting shares because it invested $958,300, and Smith owned 3,142 non-voting shares because he invested $314,200.  (Doc. 135-19 at 11.)  The September 18 letter to Smith concluded:  "We extend our congratulations to you for achieving this milestone and look forward to working with you to achieve your end objective of 100% ownership."  (Doc. 166-3 at 2.)

- 5 -

### 4.    Managerial policies

In addition to the three sets of contracts described above, Smith's role as General Manager was governed by two documents: Chrysler's Marketing Investment Financial and Operating Policies (Doc. 150-4) and Dealership Secretary-Treasurer's Guide (Doc. 150-5.)   These documents outlined the contours of Smith's managerial authority, requiring him to manage in certain ways and prohibiting him from managing in other ways.   (*See* Doc. 135 at ¶¶ 51-65.)   In particular, Smith was required to report to the dealership's Board of Directors periodically and to obtain approval by the Board before taking certain actions.   (*See id.* at ¶¶ 56, 58, 67-72.)

The parties dispute whether these policies actually limited Smith's managerial authority in a meaningful way.   (*Compare* Doc. 135 at ¶ 66 (characterizing policies as imposing "close oversight") *with* Doc. 168 at ¶ 66 (characterizing policies as imposing "little oversight").)

### C.    Smith's Relationship with Chrysler in Arizona: the Circumstances

Upon Chrysler's agreement to help finance Smith's acquisition of the Arizona dealership via the Marketing Investment program, Smith moved his family from Virginia to Arizona.   (*See* Doc. 166 at ¶ 5.)

For the first several years, the Arizona dealership was profitable and Smith used portions of his annual bonuses to buy more of Chrysler's shares.   (Doc. 166 at ¶ 16; Doc. 173 at ¶ 16.)   Starting in 2007, however, dealership sales fell dramatically.   (Doc. 166 at ¶¶ 19-20.)   During this time, the dealership had difficulty obtaining a working capital loan.   (*Id.* at ¶¶ 21-26.)   But in 2011 and 2012, the dealership became profitable again.   (*Id.* at ¶¶ 27-29.)

On June 16, 2012, Chrysler senior manager Mitch Mitchell emailed Smith, requesting that he submit a plan for completing his purchase of Chrysler's stock by March 31, 2013.   (Doc. 166-18 at 2.)   This email was the first time Smith was made aware of a deadline as to his stock purchases.   (Doc. 166 at ¶ 32.)   The email stated that this stock buyout option would be available only if Smith could increase dealership sales

to meet certain Minimum Sales Requirements. (Doc. 166-18 at 2.) The email further stated that if Smith were to fail to purchase all of Chrysler's stock by March 31, 2013, Chrysler "may exert its right to terminate [his] status as a general manager under this program and proceed with terminating [his] interest in the dealership." (*Id.*)

Despite this warning, Smith thought he would be able to meet the Minimum Sales Requirements and purchase Chrysler's remaining stock in the dealership by the deadline. (Doc. 166 at ¶ 34.)

On October 4, 2012, Mitchell sent Smith another email explaining the steps necessary to purchase Chrysler's remaining stock and pointing out that Smith had so far achieved only 71.2% of the Minimum Sales Requirements. (Doc. 166-22 at 2.) The parties dispute whether Chrysler usually views Minimum Sales Requirements as general guidelines or strict requirements. (*Compare* Doc. 166 at ¶ 31 *with* Doc. 135 at ¶ 84.)

On October 29, 2012, Mitchell terminated Smith as General Manager and as a Director of the dealership without prior written notice. (Doc. 166 at ¶ 43.) At that time Mitchell also gave Smith an agreement to sign, which stated he was terminated and purported to offer him the audited book value of his investment in the Dealership. (Doc. 48 at ¶¶ 28-29, Doc. 50 at ¶¶ 28-29.) Smith declined to sign. (Doc. 48 at ¶ 30; Doc. 50 at ¶ 30.)

At the time of his termination Smith owned most of the dealership's stock, although the parties dispute exact figures. (*Compare* Doc. 166 at ¶ 44 (asserting Smith owned 68.5% of the stock) *with* Doc. 173 at ¶ 44 (asserting Smith owned 59.7% of the stock).)

Chrysler has identified several reasons why it terminated Smith in addition to his low sales and slow stock purchase. (*See* Doc. 135 at ¶¶ 88-100.) These include his failing to take care of cars on his lot, valuing vehicles incorrectly, and violating Chrysler's conflict-of-interest policy. (*See id.*) Smith disputes both the genuineness and underlying factual accuracy of these alleged reasons. (*See* Doc. 166 at ¶¶ 88-100.)

### D.    Smith's Response to Termination

To challenge his termination, Smith first lodged a petition with the Arizona Department of Transportation, but the Department refused to hold a hearing because of an arbitration clause in the parties' contracts.  (Doc. 19 at ¶¶ 84-85.)[3]

On August 21, 2013, Smith filed suit in this Court.  (Doc. 1.)  Smith alleges Chrysler violated the common-law duty of good faith and fair dealing, the federal Automobile Dealers' Day in Court Act, and various Arizona statutes protecting automobile dealers.  (Doc. 19 at 14-15, 19-21, 23-26.)  In addition, Smith and Chrysler both seek declaratory judgment on ancillary matters.  (*See* Doc. 19 at 16-18; Doc. 48 at 55-56.)  Smith and Chrysler have filed cross-motions for summary judgment on Smith's claims.  (Doc. 165; Doc. 134.)

## IV.   ANALYSIS

Plaintiff's claims arise from three different sources of legal protection governing contracts.  The most familiar is the common-law duty of good faith and fair dealing, which Arizona law implies in every contract, *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490 ¶ 59, 38 P.3d 12, 28 (Ariz. 2002), and which Michigan law recognizes when one party to a contract makes its performance a matter of its own discretion, *Burkhardt v. City National Bank of Detroit*, 57 Mich. App. 649, 652, 226 N.W.2d 678, 680 (1975).

In franchise contracts between automobile dealers and manufacturers, there are additional statutory protections.  These additional protections are aimed at equalizing "the gross disparity in bargaining power between the large automobile manufacturers and their

---

[3] As explained in a previous order, neither party seeks to enforce this arbitration clause, and in any event it is invalid under Arizona and federal law. *Smith v. Chrysler Grp. LLC*, No. CV-13-01732-PHX-NVW, 2014 WL 1577515, at *8 & n.1 (D. Ariz. Apr. 19, 2014).

many relatively small, retail dealers." *Marquis v. Chrysler Corp.*, 577 F.2d 624, 635 n.21 (9th Cir. 1978).

At the federal level is the Automobile Dealers' Day in Court Act ("Federal Dealers' Act"). 15 U.S.C. §§ 1221 *et seq*. The statute authorizes an automobile dealer to sue an automobile manufacturer in federal court for damages caused by the manufacturer's failure to act in "good faith" in complying with the parties' franchise agreement or in terminating the dealer's franchise. 15 U.S.C. § 1222. This statutory duty of "good faith" is narrower than the common-law duty. Whereas common law prohibits "doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement," *Wells Fargo*, 201 Ariz. at 490 ¶ 59, 38 P.3d at 28, the statute merely prohibits "coercion, intimidation, or threats of coercion or intimidation," *see* 15 U.S.C. § 1221(e). Thus, the statute gives a federal cause of action for some of the bad faith conduct that is actionable at common law.

Arizona statutes afford broader protection. Title 28, Chapter 10, Section 4307 of the Arizona Revised Statutes authorizes an automobile dealer to sue an automobile manufacturer for damages caused by "a violation of this chapter." A.R.S. § 28-4307. Because "this chapter"—Chapter 10 of Title 28—contains a multitude of specific rules, the resulting duty imposed on manufacturers extends well beyond the common-law duty of good faith. Importantly, Chapter 10 sets forth procedures governing a manufacturer's ability to terminate a dealer's franchise. The manufacturer must first give written notice of its intention to terminate, along with its reasons for termination, to both the dealer and the Arizona Department of Transportation. A.R.S. § 28-4453(D). The dealer may then demand an administrative hearing at which the manufacturer must prove good cause for termination. A.R.S. §§ 28-4454(A), 28-4456(A), (C). In some cases, good cause is established if, among other things, the manufacturer has given the dealer 180 days to cure alleged deficiencies. *See* A.R.S. § 28-4457(D)(3).

These federal and state causes of action, by their terms, are available only to automobile "dealers." 15 U.S.C. § 1222; A.R.S. § 28-4307. Therefore the threshold

question regarding Smith's statutory claims is whether he was a "dealer."   On this question both parties seek summary judgment.

### A.   Dealer or No Dealer

The Federal Dealers' Act defines "automobile dealer" as "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons."   15 U.S.C. § 1221(c).   The Act defines "franchise" as "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract."   15 U.S.C. § 1221(b).

The Arizona definitions are structurally different but substantively similar.   The statute defines "motor vehicle dealer" by listing types: "new motor vehicle dealer," "used motor vehicle dealer," etc.   A.R.S. § 28-4301(22).   Those types are then defined further.   *See, e.g.*, A.R.S. § 28-4301(25) (defining "new motor vehicle dealer").   The statute defines "franchise" as "a contract between two or more persons" where (a) a commercial relationship is involved, (b) the franchisee has the right to sell new motor vehicles manufactured or distributed by the franchisor, (c) the franchisee, as a separate business, is part of the franchisor's distribution system, (d) the operation of the franchisee's business is substantially associated with the franchisor's trade name, and (e) the franchisee's business substantially relies on the franchisor to supply new motor vehicles.   *See* A.R.S. § 28-4301(12).

The parties do not cite any case interpreting the word "dealer" as used in the Arizona statutes, nor does the Court know of any.   In contrast, courts have interpreted the word "dealer" under the Federal Dealers' Act in a variety of factual contexts.   These cases guide the determination of whether Smith is a "dealer" under Arizona law as well as federal law.   *See Sell v. Gama*, 231 Ariz. 327, 327 ¶ 18, 295 P.3d 421, 425 (2013) (stating Arizona will defer to federal case law construing parallel federal statute unless there is good reason to depart from federal decisions).

- 10 -

In *Kavanaugh v. Ford Motor Co.*, the Seventh Circuit was presented with facts remarkably similar to the present case. 353 F.2d 710 (7th Cir. 1965). Three contracts jointly created a relationship among an automobile manufacturer (Ford), an individual (Kavanaugh), and a dealership (Dan Kavanaugh Ford, Inc.). *Id.* at 712-14. Kavanaugh was made an employee and shareholder of the dealership. *Id.* As an employee he was the dealership's "general manager" and "president" but only one of four "directors," the rest of whom represented Ford. *Id.* at 714-15 & n.7. As a shareholder he invested $30,000 in exchange for 300 shares of the dealership's common stock, while Ford invested $120,000 in exchange for 1200 shares of preferred stock. *Id.* at 712. At the end of each year, Kavanaugh was to buy some of Ford's remaining shares using his yearly employee bonus. *Id.* However, Ford was to retain all voting rights until Kavanaugh bought all remaining shares. *Id.* This relationship held for about four years, at the end of which the dealership's directors terminated Kavanaugh's employment and Ford canceled the shareholder arrangement. *Id.* at 714-15.

On those facts the Seventh Circuit held that "in legal contemplation [Kavanaugh] was an automobile dealer 'operating under the terms of a franchise' within the meaning of" the Federal Dealers' Act. *Id.* at 717-18. Given the factual similarities between that case and this one, the Seventh Circuit's reasoning is highly persuasive here and worth tracing in detail.[4]

### 1. Determination of dealer status is not formalistic.

In *Kavanaugh*, Ford took the position that the "dealer" for purposes of the Federal Dealers' Act was the dealership itself, not Kavanaugh individually. *Id.* at 715. In support of this position, Ford made two arguments. First, Ford argued that the relevant "franchise" for statutory purposes was the contract between Ford and the dealership, not

---

[4] Admittedly, *Kavanaugh* involved a different procedural posture. There the Seventh Circuit affirmed the district court's denial of summary judgment for the defendant, *id.* at 718, whereas here summary judgment on this issue will be granted for the plaintiff. But the procedural posture in *Kavanaugh* did not seem to affect the court's *reasoning*, which is what is persuasive here in light of undisputed facts.

the contract between Ford and Kavanaugh or the contract between the dealership and Kavanaugh. *Id.* Second, Ford argued that the dealership was a corporate entity separate from both Ford and Kavanaugh, whose separateness should be recognized. *Id.* at 717. The Seventh Circuit rejected both arguments.

As to Ford's first argument, the Seventh Circuit found that the statutory term "franchise" could include more than "the document ostensibly designated as the franchise" by the parties. *Id.* Thus, to ascertain "the actual relationship of the parties," the court examined all three of the contracts relevant to the transaction because each constituted "an inseparable part of the mutual understanding" between the parties. *Id.* The court further noted that "the circumstances attending the execution of the agreements and the post-execution behavior of the parties are relevant considerations." *Id.* at 715-16. In other words, the court, unsatisfied with formal labels, inquired as to the underlying substance of the parties' relationship.

This focus on substance is necessary to effectuate the Federal Dealers' Act. The whole point of giving automobile dealers statutory protection in addition to common-law protection is to combat the "gross disparity in bargaining power" between dealers and manufacturers. *Marquis*, 577 F.2d at 635 n.21. Absent such protection, franchise agreements might become one-sided and include terms solely for the manufacturer's benefit. *Id.* To determine "dealer" status solely by reference to labels in contracts over which manufacturers have dominant influence would allow manufacturers to contract around the statute. Congress did not intend that result. It passed the Federal Dealers' Act to provide federal review "irrespective of contractual provisions." *Id.* at 633 n.15 (quoting H.R.Rep., No. 2850, 84th Cong., 2d Sess. (1956), *reprinted in* [1956] U.S.Code Cong. & Admin.News, at 4596).

For similar reasons, *Kavanaugh*'s focus on substance over form is even more appropriate when determining "dealer" status under the Arizona statutes. The Arizona legislature chose to provide automobile dealers with more robust protection than Congress did. This protection includes procedural rights to notice, a good cause hearing,

and possibly an opportunity to cure, when faced with franchise termination. *See* A.R.S. §§ 28-4453 *et seq*. These rights evince a stronger legislative intent to guard against manufacturers' disproportionate bargaining power. Accordingly, contractual labels are even less useful when determining "dealer" status for purposes of the Arizona statutes.

As to Ford's second argument in *Kavanaugh*, the Seventh Circuit rejected Ford's characterization of the dealership as a distinct corporate entity in light of the "settled doctrine that the fiction of corporate entity will be disregarded whenever it has been adopted or used to evade the provisions of a statute." 353 F.2d at 717. The court found that treating the dealership as the "dealer" for purposes of the Federal Dealers' Act would effectively insulate Ford from liability under the statute because Ford controlled the dealership and would not sue itself. *Id.*

These same considerations apply here. Even though Smith was part owner and general manager of the dealership, Chrysler owned all the dealership's voting stock and controlled the majority of the dealership's Board of Directors. Thus, as a practical matter, the dealership would sue Chrysler only if Chrysler wanted it to. To treat the dealership as the "dealer" in these circumstances would insulate Chrysler from liability under both the Federal Dealers' Act and the Arizona statutes, since Chrysler acting as "dealer" would not sue itself acting as "manufacturer".

Therefore, Chrysler's contentions that the Arizona dealership was the "dealer" by virtue of the parties' contractual labels and the dealership's corporate separateness are unpersuasive.

Given *Kavanaugh*'s rejection of formalistic labels, the question becomes: How does one determine whether Smith was a "dealer"?

### 2. The touchstone inquiry here is whether Smith was deemed "essential" to the dealership's operation.

In *Kavanaugh*, after examining the substance of the parties' relationship, the Seventh Circuit concluded that Kavanaugh was not merely regarded as "someone who desired to invest in a business enterprise" or "someone being employed to manage the

- 13 -

dealership," but was "deemed essential to the operation of the dealership."  353 F.2d at 716.  In reaching this conclusion the court noted several factors, most of which are present in this case too.  Other factors in this case also support the conclusion that Smith was essential to the dealership's operation.

### a.  Smith applied for the dealership as an individual.

The Seventh Circuit noted that Kavanaugh applied to Ford for a dealership as an individual, and that Ford treated him "as an individual applicant, not as someone applying on behalf of a corporation."  *Id.*

So too here.  In Smith's "Application for Dealer Agreement," he applied as an individual.  He provided personal information such as his name, education, business experience, references, financial assets and liabilities, and credit score.  In response to the question of who would manage the proposed dealership, he wrote "I will, Alfonzo Smith."  Upon receipt of Smith's application, Chrysler's National Dealer Placement Manager requested a "Dealer Background Report" on Smith.  Chrysler thus viewed Smith as an individual applicant.

On this point, Chrysler attempts to distinguish *Kavanaugh* by pointing out that Smith sent a letter asking to be employed as the dealership's General Manager.  But that is not a distinction because Kavanaugh was general manager too.  353 F.2d at 714.  Moreover, at oral argument Chrysler conceded that the letter sent by Smith had been drafted by Chrysler.

### b.  Chrysler entered into the arrangement with the dealership in reliance on Smith's role.

The Seventh Circuit also noted that the contract between Ford and the dealership emphasized Kavanaugh's importance in several ways.  The contract was executed in express reliance on the representation that Kavanaugh would be part owner of the dealership and would have "full managerial authority and responsibility for the operating management" of the dealership.  *Id.* at 716.  Indeed, the contract gave Ford the right to back out if Kavanaugh were to lose his ownership interest or management position.  *Id.* The contract's preamble also praised "individual businessmen" as best able to sell

automobiles.  *Id.*  And the contract gave the dealership the name "Dan Kavanaugh Ford, Inc."  *Id.*

Here, the contract between Chrysler and the Arizona dealership similarly emphasizes Smith's importance.  The contract lists Smith and Chrysler as the only dealership shareholders and warrants "there will be no change affecting more than 50% of the ownership interest," nor any change in ownership interest which may affect the dealership's "managerial control," without Chrysler's "prior written approval."  The contract also lists Smith and one other employee as the only dealership managers, states Chrysler "has entered into this Agreement relying on the active, substantial and continuing personal participation" of these managers, and prevents the dealership from changing management "personnel" or "the nature and extent of [their] management participation" without Chrysler's "prior written approval."  The contract's introduction summarizes the point well: "[Chrysler] has entered into this Agreement in reliance upon and has placed its trust in the personal abilities, expertise, knowledge and integrity of [the dealership's] principal owners and management personnel, which [Chrysler] anticipates will enable [the dealership] to perform the personal services contemplated by the Agreement."  The contract stops short of naming the dealership after Smith, however.

Chrysler attempts to downplay the importance of Smith's role in this contractual arrangement by identifying limits on his managerial authority.  To that end, Chrysler cites its Marketing Investment Financial and Operating Policies and Secretary-Treasurer's Guide, which required Smith to manage in certain ways and prohibited him from managing in other ways.  Chrysler also identifies instances where Smith needed approval by the dealership's Board of Directors before taking action, because he was only a part owner and had not bought the dealership via private capitalization.

As an initial matter, it is not clear how these limits on Smith's managerial authority distinguish this case from *Kavanaugh*.  The *Kavanaugh* opinion does not discuss the limits on Kavanaugh's managerial authority.  Even so, one can infer there were *some* limits.  The contract between Kavanaugh and Ford set forth the dealership's

"general method of operation."  353 F.2d at 712.  Kavanaugh must have been subject to Board approval because the Board fired him.  *Id.* at 715.  And Kavanaugh, like Smith, owned only part of the dealership.  *Id.* at 712.

More fundamentally, the limits on Smith's authority do not change the fact that Chrysler entered into this contractual arrangement in express reliance on Smith's continuing role as manager and increasing role as shareholder.  The whole arrangement was basically a financing device by which Smith could become the dealership's full owner.  Chrysler's limits on Smith's managerial authority do not change the nature of the transaction.  Indeed, such limits are to be expected where, as here, the individual plays such an important role in the underlying contractual arrangement that the manufacturer expressly relies on that role when entering the arrangement with the dealership.

### c. At termination, Smith was a long-time manager and majority shareholder.

In deciding that Kavanaugh was "essential" to the dealership, the Seventh Circuit did not assign any weight to the length of his tenure as general manager or the percentage of dealership shares he had acquired.  Perhaps that is because neither factor carried much weight in that case.  At termination, Kavanaugh had been at the dealership less than four years and had not acquired even 25% of the total shares.  353 F.2d at 712, 714-15.

By contrast, Smith was terminated after serving as dealership general manager for approximately ten years and after acquiring a clear majority of the dealership's shares.[5] Thus, if anyone at the dealership was "essential" to the dealership's operation at the time of Smith's termination, it was Smith.

### d. Without Smith, Chrysler's arrangement with the dealership would have been illegal.

Arizona law generally prohibits an automobile manufacturer from "having an ownership interest" in a dealership,[6] but provides an exception for manufacturers that

---

[5] However, because Chrysler still owned some stock, Smith had no voting stock.

[6] The statutory prohibition refers to ownership interests in a new or used "dealer," whereas the statutory exception refers to owning a "dealership."  *Compare* A.R.S. § 28-

"temporarily" own a dealership while in a bona fide relationship with a "qualified person."  A.R.S. §§ 28-4460(A), (B)(1), (B)(1)(b).  For this exception to apply, the "qualified person" must make a substantial "initial investment" in the dealership, must buy the manufacturer's remaining ownership interest in "regular periodic payments," and must be able to "expect to acquire and retain full and complete ownership of the dealership" within a reasonable period of time.  A.R.S. § 28-4460(B)(1)(b)(i)-(v).

In the arrangement between Smith and Chrysler, Smith was supposed to play the role of the "qualified person."  He made a substantial initial investment in the dealership, he regularly bought portions of Chrysler's ownership interest, and he hoped to acquire full ownership.  Smith's intended role as a "qualified person" was essential because it was necessary to prevent Chrysler's ownership interest in the dealership from violating Arizona law.

For all these reasons, even viewing the evidence in the light most favorable to Chrysler, Smith played an essential role in the dealership's operation and was a "dealer" operating under a "franchise" with Chrysler for purposes of the Federal Dealers' Act and the Arizona statutes.

## B.     Duty of Good Faith Under the Federal Dealers' Act

The Federal Dealers' Act authorizes an automobile dealer, such as Smith, to sue a manufacturer for failing to act in "good faith."  15 U.S.C. § 1222.  The statute defines "good faith" as each party's duty to "act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party."  15 U.S.C. § 1221(e).

The "failure to exercise good faith within the meaning of the Act has a limited and restricted meaning. . . . It does not mean 'good faith' in a hazy or general way, nor does it mean unfairness.  The existence or nonexistence of 'good faith' must be determined in

---

4460(B)(1) *with* A.R.S. § 28-4460(B)(1)(b).  The statute then defines both words— "dealer" and "dealership"—as meaning the same thing: a "new motor vehicle dealer or franchisee."  A.R.S. § 28-4460(E)(2).

the context of actual or threatened coercion or intimidation." *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir. 1978) (citation omitted). "Coercion or intimidation must include a wrongful demand which will result in sanctions if not complied with, and it is necessary to consider not only whether the manufacturer brought pressure to bear on the dealer, but also his reason for doing so." *Id.* (citation omitted). When a termination of a franchise is involved, "there must be a 'causal connection' between the dealer's resistance to the coercive conduct and the termination." *Id.* "The existence of coercion or intimidation depends upon the circumstances arising from each particular case." *Id.*

Here, Smith claims Chrysler unlawfully "coerced or intimidated" him by (1) wrongfully demanding that he increase his sales numbers to a certain minimum and purchase the outstanding stock in the dealership by a certain deadline or else he would be subject to termination and (2) then terminating his employment and ownership interest before that deadline for failing to meet the minimum sales requirement and failing to purchase the outstanding stock. On Smith's view, this one-two punch violated the Federal Dealers' Act because Chrysler "set[] an unrealistic goal" and then "selectively terminate[d] one dealer for failing to meet that goal." *Autohaus*, 567 F.2d at 912 (generally noting such conduct may violate Federal Dealers' Act); *see also Marquis v. Chrysler Corp.*, 577 F.2d 624, 635 (9th Cir. 1978) (holding evidence supported verdict of bad faith under Federal Dealers' Act where Chrysler selectively enforced minimum sales requirement).

Chrysler denies both prongs of Smith's theory. First, Chrysler argues that its demand of higher sales and faster stock purchases was realistic and reasonable in light of its contracts with Smith. Second, Chrysler argues that even if this demand was coercive, there was no "causal connection" between the demand and Smith's termination because Smith was terminated for other reasons.

There is evidence in the record supporting each party's theory.  Therefore, whether Chrysler violated the "good faith" duty of the Federal Dealers' Act is an issue of fact that cannot be resolved on summary judgment.

### C.     Requirements Under the Arizona Statutes

The Arizona statutes authorize an automobile dealer, such as Smith, to sue a manufacturer for violating Chapter 10 of Title 28, Arizona Revised Statutes, if the violation causes the dealer to suffer "pecuniary loss" or to be "otherwise adversely affected."  A.R.S. § 28-4307.  Smith seeks summary judgment with respect to violations of two separate sections of Chapter 10: A.R.S. §§ 28-4453 and 28-4460.

#### 1.      Notice and ensuing procedural rights

Chapter 10 sets forth procedures governing a manufacturer's ability to terminate a dealer's franchise.  The manufacturer must first give written notice of its intention to terminate, along with its reasons for termination, to both the dealer and the Arizona Department of Transportation.  A.R.S. § 28-4453(D).  The dealer may then demand an administrative hearing at which the manufacturer must prove good cause for termination.  A.R.S. §§ 28-4454(A), 28-4456(A), (C).  In some cases, good cause is established if, among other things, the manufacturer has given the dealer 180 days to cure alleged deficiencies.  *See* A.R.S. § 28-4457(D)(3).

It is undisputed that Chrysler did not give notice of its intention to terminate its franchise as described in A.R.S. § 28-4453(D) and that therefore Smith was unable to exercise his ensuing procedural rights, such as a demand for a good cause hearing.  Therefore summary judgment will be granted in favor of Smith as to his claim that Chrysler violated A.R.S. § 28-4453.

#### 2.      Chrysler's ownership interest in the dealership

Chapter 10 generally prohibits an automobile manufacturer from "having an ownership interest" in a dealership, but provides an exception for manufacturers that "temporarily" own a dealership while in a bona fide relationship with a "qualified person."  A.R.S. §§ 28-4460(A), (B)(1), (B)(1)(b).  For this exception to apply, the

"qualified person" must make a substantial "initial investment" in the dealership, must buy the manufacturer's remaining ownership interest in "regular periodic payments," and must be able to "expect to acquire and retain full and complete ownership of the dealership" within a reasonable period of time.  A.R.S. § 28-4460(B)(1)(b)(i)-(v).

In the arrangement between Smith and Chrysler, Smith was supposed to play the role of the "qualified person."  He made a substantial initial investment in the dealership, he regularly bought portions of Chrysler's ownership interest, and he hoped to acquire full ownership.

In reality, Smith was not a "qualified person" because he was not able to "expect" to acquire full ownership of the dealership.  Smith's contract with the dealership contained an at-will employment clause that purported to give Chrysler, as the dealership's sole voting stockholder, the "absolute right" to remove Smith as a Director and employee.  Chrysler used this at-will clause to terminate Smith's employment and ownership interest in the dealership.  Indeed, Chrysler has stressed the importance of this at-will clause throughout its summary judgment motion.  (*See, e.g.*, Doc. 134 at 1, 2, 4, 5, 8, 12, 13, 14, 15, 16, 17.).  If, as Chrysler contends, this clause actually rendered Smith's employment and ownership interest terminable at the will of the entity that controlled the dealership's voting, Smith could not have "expected" to acquire full ownership, in which case he was not a "qualified person," in which case Chrysler's ownership interest in the dealership violated A.R.S. § 28-4460.  Thus, Chrysler's exercise of the at-will clause removes Chrysler from the "qualified person" safe harbor that its contracts were otherwise designed to invoke.

The parties dispute whether this violation of A.R.S. § 28-4460 harmed Smith but do not adequately brief the issue.  Chrysler says Smith was not harmed because the statute by its terms is aimed at preventing a manufacturer from "compet[ing] with or unfairly discriminat[ing] among its dealers."  A.R.S. § 28-4460(A).  On Chrysler's view, the statute prohibits a manufacturer from owning a dealership in order to protect dealers in *other* dealerships.  But Smith was a Chrysler dealer too, and Chrysler arguably

1 "competed" with him in the extreme by exercising the at-will clause in a way that

2 forfeited his dealership.  On this record and in view of the cursory briefing on the issue, it

3 is debatable whether Chrysler's violation of A.R.S. § 28-4460 caused or contributed to

4 Smith's injury.  That causation question must be left for trial.

5      **D.**     **Common-Law Duty of Good Faith and Fair Dealing**

6        Arizona law implies a duty of good faith and fair dealing in every contract, *Wells*

7 *Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension*

8 *Trust Fund*, 201 Ariz. 474, 490 ¶ 59, 38 P.3d 12, 28 (Ariz. 2002), and Michigan law

9 recognizes the duty when one party to a contract makes its performance a matter of its

10 own discretion, *Burkhardt v. City National Bank of Detroit*, 57 Mich. App. 649, 652, 226

11 N.W.2d 678, 680 (1975).

12        One of the contracts at issue here—namely, the contract between Chrysler and

13 Smith—contains a Michigan choice-of-law clause.  The parties dispute whether Michigan

14 law or Arizona law supplies the common-law duty of good faith and fair dealing that

15 governed their relationship.[7]

16        The Court need not decide which law governs here because neither would permit

17 summary judgment.  As stated above in Part IV.B, Smith and Chrysler have advanced

18 different theories as to why Smith was terminated, and there is evidence in the record

19 supporting each party's theory.

20

21

_____

22     [7] This is a complex question.  The Michigan choice-of-law clause was present in only one of several contracts that formed the arrangement between Chrysler and Smith.

23 Thus, a threshold issue is whether, or to what extent, Smith's bad faith claims arise out of

24 the contract that the choice-of-law clause purports to govern.  Further, even to the extent Smith's claims arise out of that contract, Arizona law on good faith and fair dealing may

25 apply despite the choice-of-law clause if (1) the particular issue is not "one which the parties could have resolved by an explicit provision in their agreement" and (2)

26 application of Michigan law would be contrary to Arizona's "fundamental policy."  *See*

27 *Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 267, 77 P.3d 439, 442 (2003) (quoting

28 Restatement (Second) of Conflict of Laws § 187 (1971)).

Chrysler misconstrues *White v. AKDHC, LLC*, 664 F. Supp. 2d 1054 (D. Ariz. 2009).  Chrysler quotes the case for the broad proposition that "a termination without cause does not breach the implied covenant of good faith and fair dealing."  *Id.* at 1065.  The court's actual statement was expressly limited to the context of a "pure at-will employment contract":

> In the context of a pure at-will employment contract with no agreed-to benefits and no promise of continued employment or tenure, a termination without cause does not breach the implied covenant of good faith and fair dealing.

*Id.*  Moreover, the court immediately clarified that, even in the context of at-will employment contracts, conduct other than termination could violate good faith and fair dealing:

> However, a viable claim for breach of the implied covenant may lie if a plaintiff is alleging that conduct other than the termination itself breached the covenant.

*Id.*

This case involves more than a "pure at-will employment contract" because Smith was not just the dealership's employee but also a part owner contractually obliged to buy dealership stock until becoming full owner.  Accordingly, Smith claims not only that he was fired unlawfully but also that he was deprived of his reasonable expectation of acquiring full ownership.  (Doc. 19 at ¶ 140.)  *White* does not preclude Smith's claim.

Therefore, whether Chrysler violated the common-law duty of good faith and fair dealing is an issue of fact that cannot be resolved on summary judgment.

### E.    Declaratory Judgment

Smith's claims for declaratory judgment (Doc. 19 at ¶¶ 78-97) and Chrysler's counterclaims for declaratory judgment (Doc. 48 at ¶¶ 31-43) are largely misplaced.  The purpose of declaratory judgment is to adjudicate rights or obligations in cases where the dispute "has not reached the stage at which either party may seek a coercive remedy" or

where "a party who could sue for coercive relief has not yet done so." 10B Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2751 (3d ed. 1998).

Here, Smith seeks damages for claims arising under federal and state statutes and common law. Many of the parties' requests for declaratory judgment are unnecessary in light of the Court's rulings in this order, and the other requests will probably be rendered unnecessary by a resolution of Smith's remaining claims on the merits. Any unresolved requests for declaratory judgment can be addressed at trial. Thus, there is no benefit to granting or denying declaratory judgment at this stage.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment on Liability (Doc. 165) is granted in that (1) Smith was an "automobile dealer" for purposes of 15 U.S.C. § 1222 and a "dealer" for purposes of A.R.S. § 28-4307 and (2) Chrysler is liable to Smith for whatever damages he incurred as a result of Chrysler's violations of A.R.S. §§ 28-4453 and 28-4460. The Motion is otherwise denied.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. 134) is denied.

Dated this 24th day of March, 2016.

Neil V. Wake
United States District Judge

- 23 -